AARON E. JOHNSTON, executor,

*v.*

THOMAS P. McKENNA et al.

[Submitted June 11th, 1909. Decided July 21st, 1909.]

1. Where defendants in a suit fail to produce one of the defendants as a witness, or his deposition, and his testimony under the circumstances of the case is of the last importance to the other defendants, and the failure to produce him is not explained, the court will expect from the remaining defendants evidence of a character that is clear and convincing to sustain their defence, and any uncertainties in the evidence which he might have cleared up will be resolved in favor of the complainant.

2. Where a transfer of an equity of redemption of great value for a totally inadequate consideration and on an understanding that it was being taken for the benefit of the mortgagor is procured. the burden of proof, in an action to compel the transferees to account to the mortgagor,

is shifted to the transferees, who are called upon to give the utmost explanation and the freest and most open disclosures of all the facts.

3. In a suit to reach the surplus arising from a mortgage foreclosure sale, evidence *held* to show that defendants procured a transfer of the equity of redemption at a totally inadequate consideration, and under an understanding that the mortgagor's interests would be protected so as to render them liable to the mortgagor for the loss sustained.

4. Where, in a suit to reach the surplus arising from a foreclosure sale, it is shown that defendants, transferees of the equity of redemption, obtained the transfer through fraud, a decree for the loss occasioned to the mortgagor by the actions of the transferees may be had against them personally, and it is not necessary to follow the property.

5. Laches which does not prejudice the defendant, but injures only the complainant, cannot defeat the suit.

On final hearing on bill, answers, replication and proofs.

*Mr. Aaron E. Johnston* and *Mr. Frank P. McDermott*, for the complainant.

*Mr. Charles J. Roe*, for the defendant Hugh E. O'Reilly.

*Mr. Joseph Coult*, for the defendant Thomas P. McKenna.

HOWELL. V. C.

This bill is filed by the administrator of the estate of Mary E. Throckmorton to recover the sum of $8,000 or thereabouts, being the surplus money arising from the foreclosure of a mortgage on lands owned by his intestate in Monmouth county, and which it is alleged was wrongly diverted from her by the joint action of Patrick J. Reilly, Hugh E. O'Reilly, Jr., and Thomas P. McKenna. The property is known as the Rockwell Hotel. It was purchased by Mrs. Throckmorton on May 4th, 1882, from a firm of liquor dealers in New York named O'Reilly, Skelly & Fogarty. Their deed to her is dated on that day. On the same day she gave back to the firm a purchase-money mortgage for $4,900.

On account of the death of Fogarty the firm went into liquidation. He left a will by which he appointed the surviving partners to be executors thereof.

On February 23d, 1892, Mrs. Throckmorton made a second mortgage on her hotel property to the O'Reilly, Skelly & Fogarty Company to secure a loan of $2,000. This mortgage was subsequently transferred to the executors, Hugh O'Reilly and Skelly, and thus these executors, as executors and as individuals, held title to both mortgages.

On December 18th, 1899, C. A. Spalding recovered a judgment against Mrs. Throckmorton for $283. On March 22d, 1899, M. Wooley recovered one for $24, and on July 8th, 1899, Clarence Van Note recovered one for $339, on all of which executions were issued under which levies were made on the mortgaged premises. The property was advertised for sale by the sheriff of Monmouth county for July 30th, 1900, and was sold on that day to Van Note, who meantime had taken an assignment of the Spalding judgment. A sheriff's deed was made to Van Note for the property on August 2d, 1900, from which time forward he claimed to be the owner of the fee therein. Meantime taxes for several years remained unpaid. Thomas P. McKenna, one of the defendants, took title under tax sales for 1898, 1899 and 1900, which he transferred to Howard Green; Van Note therefore held title subject to the two mortgages and the tax liens.

On October 4th, 1900, the mortgagees filed their bill to foreclose the two mortgages. Mrs. Throckmorton and Van Note were parties. Mrs. Throckmorton could not be found to be served, and an attempt was made to bring her in by publication. She filed no answer, and a decree *pro confesso* was taken against her on March 23d, 1901. There was a final decree on May 20th, 1901, and *fi. fa.* issued on June 12th, 1901. The sheriff advertised the premises for sale and they were sold on August 5th, 1901, to the defendant Patrick J. Reilly for $16,300. The sum due for liens on that day was $8,263.92; this included $353.35 due to Howard Green for his tax lien. It left a surplus of $8,036.08, which is the subject-matter of this suit.

Van Note held title until the day of the sale. On that day, and just before the sale, he made a conveyance of the premises to Patrick J. Reilly. This conveyance is important and will be mentioned later on. This deed to Patrick J. Reilly gave him on

the face of the papers the title to the fee-simple of the land, and it consequently gave him a presumptive right to the surplus money. On August 14th, Patrick J. Reilly (Thomas P. McKenna acting as his solicitor) presented to this court a petition setting out the proceedings in the foreclosure suit, his purchase at the sheriff's sale, the conveyance of the fee to Patrick J. Reilly by Van Note, and his claim to the surplus money, and praying that an order might be made directing the sheriff to accept his receipt as payment of the balance of the purchase-money. On that day an order was made referring the matter to a special master to ascertain the truth of the allegations, and also whether the petitioner was entitled to have the sheriff accept his receipt for the surplus money. A report was made upon this reference on August 16th in accordance with the prayer of the petition, which was confirmed on August 20th by an order that directed the sheriff to accept the receipt of Patrick J. Reilly as payment to the extent of the balance of the purchase-money arising from the sale over and above the amount directed to be raised by the execution. It was by this means that the surplus money was diverted from Mr. Van Note and Mrs. Throckmorton to Patrick J. Reilly.

At the time of the sheriff's sale the property was in the actual possession of one Vaugoine, who held under a lease from Nathanson, who held under Mrs. Throckmorton. Vaugoine attorned to Van Note, and Nathanson's attempt to assert title failed. Vaugoine paid Van Note rent at the rate of $1,500 a year, besides sewer and water rents and repairs.

The event which led up to this suit occurred a few days before the foreclosure sale. There is no doubt but that McKenna and Hugh E. O'Reilly, or certainly McKenna, attempted to purchase Mrs. Throckmorton's interest in the property some time before the foreclosure sale. This is shown by the testimony of Mr. and Mrs. Childs, at whose house Mrs. Throckmorton was living. They state that Mr. McKenna and another gentleman came there to see Mrs. Throckmorton and that they attempted a negotiation with her about this property, but that she refused to sell them her interest. This statement of these two witnesses is partially denied, although both O'Reilly and McKenna admit

that they went to the Childs' house on at least one occasion for the purpose of seeing Mrs. Throckmorton. Van Note says that he met Mrs. Throckmorton in McKenna's office about a week before this sale, and that McKenna then and there said to him, Van Note, that he, McKenna, represented Mrs. Throckmorton, and that an agreement had been made that the O'Reilly firm, mortgagees, would protect Mrs. Throckmorton, and that Hugh E. O'Reilly became a party to the arrangement a couple of days before the sheriff's sale. Van Note says the agreement was that he was to receive $1,250 and make a conveyance of the property to Mrs. Throckmorton or to someone that she and the mortgagees together might designate, and that the property was to be held by the grantee for her benefit; or, on the other hand, if it might be so agreed, the third person might receive the rents, pay Mrs. Throckmorton a small amount for her support and use the balance to reduce the claims, and that when the claims had been reduced to a figure somewhere near the face of the original mortgages, a conveyance was to be made back to Mrs. Throckmorton, and that in the meantime, if a sale could be made, it was to be by consent of the mortgagees and Mrs. Throckmorton, and any sum received above the amount which the mortgagees had in the property and their necessary expenses was to go to Mrs. Throckmorton. He further says that in pursuance of this agreement he, on the Saturday preceding the sale, drew a deed for the premises in question to the defendant Hugh E. O'Reilly; that the defendant McKenna took the acknowledgment of Van Note and his wife, and that the defendant O'Reilly then offered him his personal check for $1,250. Van Note declined to take it until he had a consent from Mrs. Throckmorton. The defendants O'Reilly and McKenna then stated that they would not use the deed for any purpose until they had the proper authority from Mrs. Throckmorton, but desired to take the deed, leaving the check and stating they would be back later in the day. He says that they did come back about seven or eight o'clock in the evening and stated that they could not find Mrs. Throckmorton; that they were very anxious to have the sheriff's sale come off on the following Monday, and sought to obtain Van Note's release and a final delivery of the deed;

that Van Note finally consented to deliver the deed and accept a check upon the defendants' promise that they would get Mrs. Throckmorton's consent before the sale or as soon as possible afterwards. On Monday morning, the day of the sale, Van Note says that O'Reilly and McKenna came to him and asked him if he would make a deed for the premises to Patrick J. Reilly. His recollection is that a new deed was prepared by himself early Monday morning before the parties went to Freehold to attend the foreclosure sale, and that McKenna came again and took the acknowledgments, and that the old deed was destroyed. I may pause here to say that the deed in question, a certified copy of which was put in evidence, shows that it was dated and acknowledged on Saturday, August 3d, 1901. The check for $1,250, drawn by Hugh E. O'Reilly, which was delivered to Van Note on Saturday, was deposited by him on Monday morning to his credit in the Long Branch bank. Payment of that check was stopped by the drawer, and either Tuesday evening or Wednesday morning O'Reilly delivered to Van Note the check of Patrick J. Reilly for $1,250, which was deposited on Wednesday, August 7th, and was paid in regular course. The sum and substance of Mr. Van Note's testimony is that when he transferred the property to Reilly he did it at the request of O'Reilly and McKenna, and wholly for the advantage of Mrs. Throckmorton, and in order that she might have the benefit of the large equity which would remain after satisfaction of the mortgages and the tax liens. It is quite apparent that if this statement is true, or substantially true, or if there was any engagement or understanding between these parties that Mrs. Throckmorton was to have the ultimate benefit of her own property, there must, in justice, be a decree in favor of the complainant.

I do not regard the testimony as to what took place between Mr. McKenna, Mr. O'Reilly, Mr. Duffy and Mr. Van Note on the beach after the sheriff's sale as of much importance in the case, for the reason that at that time Mr. Van Note does not appear to have been convinced or to have had any notice of the fact that McKenna and O'Reilly did not intend to deal with Mrs. Throckmorton in accordance with his, Van Note's, agreement with them, concerning her. This conversation took place

in August of 1901, after the sale but prior to its confirmation and the delivery of the deed, and whatever Mr. Van Note said at that time seems to me to be entirely consistent with his idea that ultimately Mrs. Throckmorton was to get the benefit of the transaction.

The same course of reasoning applies to the efforts made by Mr. Van Note to procure a discharge of the notice of *lis pendens* which accompanied the suit against him and his efforts to aid McKenna and O'Reilly to get in the tax title which was outstanding in the name of Green; he does not appear at that time to have suspected that there was any disposition to deprive Mrs. Throckmorton of the benefit of the contract which he claims to have made on her behalf.

The foreclosure sale took place at Freehold on Monday afternoon, August 5th. The sale was confirmed on September 3d. The deed made to Patrick J. Reilly in pursuance thereof was dated, acknowledged and recorded on September 5th, 1901. Nothing was paid to the sheriff on the day of the sale on account of the purchase-money. Mr. Duffy, who was the mortgagees' solicitor, acted at the sale for the purchaser Reilly. He says that he waived the payment of the percentage. Meantime, and before the execution and delivery of the sheriff's deed, and on August 10th, 1901, P. J. Reilly made a mortgage for $2,000 on the property to Hugh E. O'Reilly. This was made, as Hugh E. O'Reilly says, to secure three loans, one for $1,250, the date of which O'Reilly does not know, one for $250 a few days later, and another for $500, the date of which is not given.

I have no difficulty in believing that the $1,250 loan was the money paid to Van Note for the conveyance just prior to the foreclosure sale, and that the other amounts were for other payments connected with the transaction. The tax title of Howard Green footed up about $375, and there were doubtless other necessary expenses. The manner of securing this debt is a novel one; it was by a mortgage on the lands sold, the title to which had not yet passed to the purchaser. O'Reilly explains this by saying that he had full confidence in Reilly because they had been partners in business. This mortgage was canceled November 2d, 1901.

Mr. Duffy says that about November 1st, 1901, Patrick J. Reilly, the purchaser of the premises, executed a mortgage to a man named Hinds for $8,000. This money was used for the purpose of paying off the complainants in the foreclosure suit. It thus appears that Patrick J. Reilly, or whoever became the real owner of the property, acquired the title thereto without the payment of any money whatever. He had satisfied the mortgages out of the Hinds loan and had satisfied the Hugh E. O'Reilly mortgage by giving him another mortgage for the same amount upon the same premises, and had thus shut out Mrs. Throckmorton from any participation in the proceeds of the sale or any interest in the property itself. The title remained in P. J. Reilly, subject to the two mortgages, until May, 1902; meanwhile it was in the possession of Vangoine as tenant. Mr. Duffy collected the rents, and he finally made sale of the premises to the tenant, Vangoine, by an agreement dated April 30th, 1902, for $14,500. The deed was executed and delivered on May 26th of the same year. Voigoine took the property at $14,500, subject to the $8,000 mortgage only, which left a surplus of $6,500 in Mr. Duffy's hands to be disposed of; this he did, as follows: He paid to himself for his fees, costs, &c., $500; he paid to Hugh E. O'Reilly, to satisfy his mortgage, the sum of $2,000; he gave his check to the defendant McKenna for $3,000, and the balance, amounting to $1,000, he paid to Hugh E. O'Reilly.

This is the framework of the facts as I find them. There is, however, controversy and denial at each stage of the case. There is, in the first place, a denial of Mr. Van Note's statement as to what was the original bargain between Mrs. Throckmorton, Mr. McKenna, Mr. O'Reilly and Mr. Van Note—a denial that Mrs. Throckmorton was to have any interest in the premises or its proceeds—a denial that Mr. O'Reilly and Mr. McKenna profited by the transaction beyond their reasonable fees and necessary expenses, and an assertion that the whole transaction was carried through by them for the benefit of Patrick J. Reilly.

Patrick J. Reilly is a defendant to the suit; he resides and at the time of the hearing resided in the city of New York; his evidence was of the last importance to the other defendants in the case; he could have cleared up many things in the testimony

which are now enveloped in a cloud of doubt. He was not produced, nor was his testimony taken by commission; nor is the failure to do either explained by either of the defendants. This is a circumstance which, under the peculiar conditions of this case, must disturb the burden of proof and lead the court to expect from the remaining defendants evidence of a character that is clear and convincing. In his absence, whatever doubts there are in the testimony which it is apparent he might have cleared up if he had been present, must be resolved in favor of the complainant. The funds in this case are finally traced to Hugh E. O'Reilly and Thomas J. McKenna, and I do not think that they have cleared themselves of the receipt thereof. Hugh E. O'Reilly says that the portion of the money that was paid to him was credited by him on account of what P. J. Reilly owed him, but he fails to produce P. J. Reilly or any books of account showing transactions with him or any documents of any nature showing the disposition of the fund or on what account it was credited. Mr. McKenna, to whom $3,000 of the fund was paid, states that out of it he was to have a fee of $1,000, and that the other $2,000 was paid in the purchase of some securities for Patrick J. Reilly, and that those securities were afterwards cashed and Mr. Reilly got his money, principal and interest, but he gives no particulars of the transactions, nor any list of the securities thus dealt in. His whole story is lacking in the details of time, place and circumstance.

I think that the burden of proof on this issue is on Mr. McKenna, and I am not satisfied with the statements that he makes. I see no reason why both O'Reilly and McKenna should not have corroborated their statements on all these points when it is obvious that it would have been so easy to do it. I cannot help believing that Patrick J. Reilly was a mere dummy in the hands of the other two defendants. He does not appear to have had anything to do personally with the transaction except to give his check for $1,250 to Van Note. Hugh E. O'Reilly furnished the money for this check which he got back from Duffy in the final distribution in May, 1902. The only other place in which he has personally appeared was before the master on the application for surplus money in the foreclosure suit.

Recurring once more to the events which took place just prior to the sale as detailed in the evidence of Mr. Fay. He says that prior to the foreclosure sale he had conversations with both Hugh E. O'Reilly and Mr. McKenna. He at that time had been retained by Mrs. Throckmorton to pursue Van Note, who held title to the mortgaged premises. In his conversation with Mr. Hugh E. O'Reilly he says that Mr. O'Reilly agreed to do what he could to, allow the loan to remain and to have the sheriff's sale adjourned and give Mrs. Throckmorton an opportunity to arrange matters so that she could hold her property; that he stated that the mortgagees were willing to do anything for her because they had known her for a long time and she had originally bought the property from them, and that if the mortgagees were eventually compelled to take the property and Mrs. Throckmorton could then make any arrangements to get it at any time thereafter, they would protect her interests. In his conversation with McKenna just prior to the sale, Mr. Fay says that he told him all the facts concerning the sale of the property under Van Note's judgment, that Van Note had agreed to make a conveyance back to Mrs. Throckmorton, and that he, Fay, had prepared a bill in Mrs. Throckmorton's favor to compel a reconveyance to her by Van Note; that he unfolded to him the plan of the suit, and that on one occasion when Mr. Fay was in Mr. McKenna's office Mrs. Throckmorton was there, and she said to Mr. McKenna: "You agreed to protect me in this matter and you were to look after my interests."

In view of all the testimony in the case, and of the fact that Mr. Fay is entirely disinterested, I am led to believe that these conversations took place, and that these disclosures were made to the defendants by Fay. If it were not true that Van Note was willing to reconvey to Mrs. Throckmorton upon favorable terms, I see no reason why he should have conveyed the property to Reilly for $1,250 unless he expected the conveyance would be used in some way for the benefit of Mrs. Throckmorton. Mr. Fay attended the sheriff's sale on August 5th, but the proceedings there do not seem to have impressed him very much. On August 12th, he, Fay, filed a bill in favor of Mrs. Throckmorton against Van Note, P. J. Reilly, Thomas P. McKenna, Hugh

O'Reilly and Joseph A. Duffy, charging generally that the property was hers and that she was being cheated out of it. This bill appears to have been prepared before the foreclosure sale as a bill against Van Note alone, and afterwards was amended so as to bring in the other defendants. Upon the filing of this bill Vice-Chancellor Reed made an order restraining Van Note from receiving any of the surplus money in the foreclosure suit and directing the sheriff to pay the same into court. This order was filed on August 19th, 1901, and appears by the testimony of Mr. Fay to have been served upon the sheriff, if not upon the other parties. If it was not served on the defendants, I do not see how knowledge of it could have escaped them; there were too many persons interested in the transaction, and there had been too much talk about the situation to permit an important order like the one now mentioned being unobserved. It was two days after the date of this order that the surplus-money petition was filed and the order of reference made to the master. It may be said just here that this bill against Van Note and others was demurred to, and upon the demurrer being sustained, was dismissed.

It is inconceivable that Van Note intended by his deed to convey the large surplus which existed in this property to either Hugh E. O'Reilly, to whom he made the first deed, or to Patrick J. Reilly, to whom he made the second deed, or that he intended that they, or either of them, should take a benefit by the transaction. There seems to be no reason why he should have wished or intended to give them a profit of several thousand dollars, nor is their presence in the transaction at all satisfactorily explained. In fact, the only explanation that was given by either of them for interfering was that Hugh E. O'Reilly had brought the property to the attention of Patrick J. Reilly, who determined that he would like to have the property for hotel purposes, yet although he held the title to the property from September, 1901, to May, 1902, he does not appear to have made any attempt to use it for hotel purposes. There is some evidence that someone attempted to procure a license for the place, but it could not have been Patrick J. Reilly, because he never lived in the premises. Van Note could probably have retained this surplus for himself; he

had given Mrs. Throckmorton a chance to redeem and she had failed; she had employed Mr. Northrop of Jersey City and Mr. Fay of Long Branch to procure loans for her with which to redeem the property from the mortgages, and he appears after her failure to have claimed the property for his own.

I am forced to the conclusion that the decree must go against the defendants upon the grounds hereinabove stated. They appear to me to have procured a transfer of an equity of redemption of great value for a totally inadequate consideration and upon a representation, or at least an understanding that it was being taken for the benefit of Mrs. Throckmorton; that these facts under well-known principles shift the burden of proof and call upon the defendants for the utmost explanation and the freest and most open disclosure of all the facts. This burden has not been met, nor has this disclosure been made, and I must therefore hold them responsible for the loss which has been occasioned to the estate of Mrs. Throckmorton by their action. Indeed, I may go further and say that in my opinion the case made by the bill has been fully proved, and that the complainant is entitled to a decree on his own showing.

I am made the more firm in my conviction of the justice of the complainant's case by a perusal of the opinion of Vice-Chancellor Pitney in the case of *Johnston* v. *Reilly*, 68 *N. J. Eq.* (2 *Robb.*) 130, in which the facts are almost identical with the facts in this case. That was a suit originally brought by Mrs. Throckmorton in her lifetime and carried on by Mr. Johnston, her administrator, after her death to a final decree. The bill was filed January 16th, 1903, against Patrick J. Reilly and Hugh O'Reilly and Patrick Skelly, individually, and as executors of Patrick A. Fogarty, deceased. The allegations of the cause of action are substantially the same as those alleged in this case. At the hearing it was conceded by the complainant that O'Reilly and Skelly could not be made liable either individually or as executors, and a decree passed against Patrick J. Reilly alone, charging him with the whole liability for the surplus money in the said foreclosure suit. At the time of the filing of the bill the present complainant, who was solicitor in that suit for Mrs. Throckmorton, states that he was unaware of the hand that Hugh E.

O'Reilly and Thomas P. McKenna had in the affair, and that it was for this reason that they were not included in that bill. Their inclusion in the present bill was made the subject-matter of a demurrer by Hugh E. O'Reilly, which demurrer was overruled by Chancellor Magie. His judgment thereon was sustained by the court of errors and appeals. *Johnston* v. *O'Reilly, 74 N. J. Eq. (4 Buch.) 448.* In the *Reilly Case, 68 N. J. Eq. (2 Robb.) 130,* on the facts therein developed, Vice-Chancellor Pitney held Patrick J. Reilly liable for the whole of the surplus money, estimating the value of the property at the price bid for it at the foreclosure sale. He charged the defendant with $16,300, with interest, from September 5th, 1901, and credited him with the sum of $1,250, with interest, from August 5th, 1901, to September 5th, 1901, and with the amount due on the foreclosure execution on September 5th, 1901, besides the sheriff's fees. The remainder, with interest to the date of the decree, was the amount for which he directed a decree.

The defendants claim that no decree can pass against them for the proceeds of the sale of the property in question, but if a fraud has been committed, the only claim the complainant can have is a claim directly against the property. I find no authority in the brief for this contention, while there is abundant authority discoverable upon the slightest search the other way. This argument can be disposed of by simply saying that if it is true all that is necessary to effectuate a fraudulent scheme for obtaining possession of and title to property, real and personal, would be to have it transferred to a *bona fide* purchaser.

The defendants likewise interpose the defence of laches. I do not see how the delay in bringing this suit has prejudiced the defendants in any particular. The only witness who has died out of the defendants' case is Hugh O'Reilly, the grandfather of the defendant Hugh E. O'Reilly, and it does not appear that he knew anything about this transaction. On the contrary, the delay has been very prejudicial to the complainant. The real party in interest, Mrs. Throckmorton, has died since the litigation began, and indeed was dead when this suit was started. I must therefore say that I cannot regard the defence of laches.

I will advise a decree in favor of the complainant upon the principles set out by Vice-Chancellor Pitney in the *Reilly Case* above cited. The complainant will be entitled to costs and to a reasonable counsel fee, to be fixed by the chancellor.