127 N.J. Super. 479 (1974)
317 A.2d 770
ALLSTATE INSURANCE COMPANY, PLAINTIFF,
v.
HOWARD SAVINGS INSTITUTION, GOOD DEAL SUPERMARKETS, INC., AND TITAN SUPERMARKET ASSOCIATES, DEFENDANTS.
Superior Court of New Jersey, Chancery Division.
Decided March 22, 1974.
*482 Mr. Marvin A. Sachs for plaintiff (Messrs. Feuerstein, Sachs & Maitlin, attorneys).
Mr. Robert A. Scanlon for defendant Howard Savings Institution (Messrs. Lynch, Booth, Kenny, Scanlon & Dougherty, attorneys).
Mr. Theodore W. Geiser for defendant Titan Supermarket Associates (Messrs. McElroy, Connell, Foley & Geiser, attorneys).
ANTELL, J.S.C.
This is an action for declaratory relief by an insurance carrier seeking adjudication of its nonliability to defendants who were named as loss payees on a fire insurance policy and proof of loss. Defendants counterclaim for judgment in the amount of damage by fire to the insured building. The controversy arises from the issuance by plaintiff of its draft in settlement of loss in the amount of $200,682.82 payable only to the tenant of the insured premises and the fire adjuster who settled the claim. Omitted therefrom were the names of defendants who are the owner and the first mortgagee of the property. The term employed by plaintiff to explain its conduct is "inadvertence," and the stakes in this proceeding are dramatically signified by the tenant's advent into bankruptcy after depositing the moneys in its general account.
The three propositions on which plaintiff rests its claim are that (1) defendants are barred from recovering under the policy by reason of conduct amounting to waiver or laches; (2) assuming their right to recover, recovery is limited to only that portion of the $200,682.82 settlement allocable to building damage, exclusive of moneys paid to the tenant for damage to "contents," and (3) in the event of recovery by the mortgagee, plaintiff is entitled to an assignment of the mortgage and the mortgagee's rights thereunder. The last of these is significant in that, for reasons to be explained, if allowed it would diminish the owner's *483 recovery under the policy by the amount of the outstanding mortgage balance, now approximately $90,000.
On March 25, 1959 Suss Leaf New Jersey, Inc., then the owner of premises at 393 Main Street, Chatham, entered a 21-year net-net lease with Good Deal Supermarkets, Inc. On August 7, 1959 Suss Leaf mortgaged the property to defendant Howard Savings Institution and on December 1, 1960 sold the premises to defendant Titan Supermarket Associates, a partnership. The conveyance was made subject to the Howard mortgage, but no formal novation was ever entered into by the interested parties. Suss Leaf also assigned the Good Deal lease to Howard on August 7, 1959 and to Titan on December 1, 1960. Paragraph 42 thereof obliges Good Deal to secure and maintain for the benefit of all parties fire and liability insurance.
Plaintiff's policy covering the premises against loss by fire was issued June 23, 1971, to expire June 23, 1972. In it the insured is described thus:
Good Deal Supermarkets, Inc., and/or its affiliated and subsidiary companies are now or may thereafter be constituted as their respective I/M/A., 550 Division St. Elizabeth, N.J.
The loss payable clause of the policy provides:
Subject to the provisions of the mortgage clause attached hereto, loss, if any, on building items shall be payable to: 1st mtgee: Howard Savings Institution 768 Broad St. Newark, N.J. and National State Bank of Elizabeth, 68 Broad St Elizabeth, and Titan Supermarket Assoc. Chrysler Building, East 666 3rd St. N.Y.N.Y. A/T/I/M/A.
It is stipulated that by "A/T/I/M/A" is meant "as their interest may appear."
By a general change endorsement the name of First National was removed as a loss payee on August 2, 1971. No explanation was given why defendant Titan was not specifically described in the foregoing clause as owner.
*484 On April 12, 1972 an extensive fire damaged the building. The resulting loss was adjusted by Good Deal through the Sarasohn Co., Inc., a public fire adjuster. On June 24, 1972 it submitted its proof of loss executed by Good Deal as "owner," and naming defendants Howard and Titan as co-loss payees.
It is timely here to note that paragraph 30 of the lease imposes upon Good Deal the duty to restore the building in the event of fire in the following terms:
If during the term of this lease the buildings or any of them erected on the demised premises be totally or partially destroyed by any cause whatsoever, there shall be no abatement of rent and the Tenant shall, at its own expense, repair, replace, rebuild and/or restore the said buildings with all reasonable diligence. The Landlord agrees that any insurance proceeds payable under the policies required herein to be maintained by the Tenant shall be used to reimburse the Tenant for, or to pay, as herein provided the costs and expenses incurred in the repairing, replacing, rebuilding and restoration of any damage to property on the demised premises in respect of which such insurance proceeds are payable, or any loss of use of the said premises.
In connection therewith, during the weeks and months following the fire, before and after issuance of the draft, Jeffrey Aidekman, Esq., house counsel for Good Deal, regularly conferred with Messrs. Kranzdorf or Lotterman, managing partners in Titan and respectively members of the Pennsylvania and New York Bars, about the progress of restoration and the payment of rent. Aidekman repeatedly assured them that Good Deal not only intended to meet its obligations under paragraph 30 of the lease but that in fact restoration was actually already in progress. Such assurances were in fact given in writing under dates of June 6, August 14 and September 20, 1972 to Titan and Howard.
The extent to which Titan was then being deceived by Good Deal can be appreciated only in retrospect. The Good Deal chain was then in serious financial difficulty and was freely utilizing the mechanics of naked fraud in order to prolong its survival. The most audacious falsehoods were relied on to neutralize any show of militancy by Titan in *485 the protection of its interests. One such incident was testified to by Mr. Kranzdorf wherein, as he recounted, he visited the premises in July 1972 to check on the status of the work which, as he had been told, was in progress. Finding the premises locked and no sign of activity evident, he returned to his office and telephoned Jeffrey Aidekman for an explanation. Aidekman, in response to this demand, was able to convince Kranzdorf that he had misinterpreted the facts, that although the doors were locked, the workmen were inside carrying on interior repairs, but so silently as to be inaudible from the outside. Actually, no repairs were either made on the building or intended to be made, and the financial circumstances of Good Deal deteriorated so badly that it was decided in September 1972 not to reopen that location under any circumstances.
On August 25, 1972, a Friday, plaintiff issued two drafts dated August 28, 1972, one in the amount of $200,682.82 payable to Good Deal Supermarkets, Inc. and Sarasohn Co., Inc., reciting that it was in payment for building damage, and a separate draft in the amount of $72,178 to the same payees covering contents. Both were picked up by the insurance broker servicing Good Deal on that day and negotiated August 28. On August 25 Sam Aidekman, the president of Good Deal, sent a letter to Titan which noted, in passing, that Good Deal had "already received the settlement from the insurance company." That letter was received by Titan August 29. The larger of the two instruments, however, was paid that same day and the funds irretrievably commingled with Good Deal's receding cash flow. It is parenthetically observed that Jeffrey Aidekman's letter of August 31, 1972 indicates the involvement of several insurance carriers in covering different aspects of the loss, and the August 25 letter is unclear as to which one was intended.
The management of Titan was "stunned" to learn that plaintiff had issued its draft without including thereon either of the defendants as loss payees. The discussions between *486 Good Deal and Titan intensified and were now broadened to include, in addition to late payment of rent and building repairs, Titan's demand that the proceeds of the insured fire loss be deposited in escrow. Jeffrey Aidekman continued his course of deception, reaffirming Good Deal's fidelity to the lease and conjuring up visions not only of a restored building, but one restored "to a condition better than it was prior to the fire." Titan continued to work toward a resolution of the dispute even after it learned of Good Deal's intention not to reopen the Chatham store. Its purpose was to salvage what it could from a failing situation, and in response to Aidekman's request that they listen to certain concrete proposals he was prepared to offer, they met with him on February 20, 1973. Apart from vague references to third parties who might be interested in taking over the property, he offered nothing. He was simply procrastinating further. Discussions terminated and counsel was engaged.
During this same interval a lively dialogue was also underway between Good Deal and plaintiff. At least by September 8, 1972 the fact that plaintiff had issued the draft erroneously had become a subject of concern within that company. This is shown by an internal memorandum of that date. On numerous dates thereafter plaintiff's representatives repeatedly told Jeffrey Aidekman that defendants' names had been mistakenly omitted from the $200,682.82 draft and implored him either to return the money or to provide some hope of indemnification to plaintiff in the event of loss. In contrast to the mendacity with which he tranquillized Titan, he frankly told plaintiff that although he was sympathetic it was "impossible" to return the money or to give indemnification. By December 1, 1972 plaintiff mailed to Jeffrey Aidekman an indemnification form to be executed by Good Deal and Titan. The request was ignored. During this period there was a complete absence of communication between plaintiff and defendant.
Defendant Howard first learned of the fire on August 1, 1972, and the fact that the draft had been issued without *487 including the names of defendants did not come to the attention of this defendant until its receipt of a letter to this effect dated January 29, 1973 from plaintiff.
Plaintiff's argument that the $200,682.82 draft embraced damage to both building and contents and that defendants' recovery, if any, should therefore be limited to such portion thereof as can be specifically allocated to building damage will be dealt with first.
The draft in question is specifically earmarked in "payment for loss to building from fire loss on 4-12-72," and at the time of its issuance there was also issued a separate draft for $72,178.00 in "payment for loss to contents from fire loss on 4-12-72." The factually descriptive testimony of Mr. Sarasohn, who adjusted the fire loss for Good Deal, leaves no doubt that the damage covered by the larger draft was exclusively to the building and did not extend to "contents." In light of all the evidence plaintiff's contention to the contrary is a frivolous afterthought.
Plaintiff's demand for an allowance in the amount of the adjuster's fee will be dismissed. This issue was nowhere dealt with in the evidence or the pretrial order.
The claim of equitable estoppel is predicated upon defendants' apparent failure to act more aggressively upon learning that the draft had been issued incorrectly in the name of Good Deal. It is argued that the alternatives available to the defendants included instituting suit, either against Good Deal or Allstate, calling the loan and, in ways not made clear by the plaintiff, taking a firmer stance with Good Deal. By failing to do so, plaintiff contends, defendants forfeited their rights on principles of waiver and laches. It is further argued that Titan had committed itself to a course of reliance upon the expectation that Good Deal would restore the premises, was therefore content to allow Good Deal to keep the proceeds, and that this decision constituted a waiver of its rights under the policy.
Waiver involves the intentional relinquishment of a known right. That the party charged with waiver knew his *488 rights and deliberately intended to relinquish them must affirmatively appear. West Jersey Title, etc., Co. v. Industrial Trust Co., 27 N.J. 144, 153 (1958). "It is a voluntary act, and implies an election by the party to dispense with something of value, or to forego some advantage which he might at his option have demanded and insisted on." Geo. F. Malcolm, Inc. v. Burlington, etc., Co., 115 N.J. Eq. 227, 232 (Ch. 1934).
It is requisite to waiver of a legal right, that there be "a clear, unequivocal, and decisive act of the party showing such a purpose or acts amounting to an estoppel on his part"; "A waiver, to be operative, must be supported by an agreement founded on a valuable consideration, or the act relied on as a waiver must be such as to estop a party from insisting on performance of the contract or forfeiture of the condition." [West Jersey Title, & Co. v. Industrial Trust Co., supra 27 N.J. at 152-153, citing Aron v. Rialto Realty Co., 100 N.J. Eq. 513, 517-518 (Ch. 1927), aff'd per curiam 102 N.J. Eq. 331 (E. & A. 1928)]
Even where an "intentional relinquishment" has occurred we are cautioned that this is not, by doctrinal standards, necessarily effective.
A contract right or other chose in action, as a rule, can no more be relinquished than created without consideration or a sealed instrument. A release or an accord and satisfaction is the ordinary way by which contractual rights are effectively relinquished. [5 Williston on Contracts (3d. ed. 1961), § 678 at 240]
Nothing has been shown to authorize the belief that either of these defendants voluntarily elected to surrender its right to recover from plaintiff the damage loss to which it was entitled under the policy. All that appears is that plaintiff mistakenly paid the wrong payee, that after the draft was issued, Titan tried to repair the situation on the premise that Good Deal was going to meet its lease obligations. If this had happened defendants might not have pursued their claim against plaintiff. Unknown to Titan, Good Deal was playing out a strategy of deceit, and for this reason Titan's sanguine *489 expectations were defeated. It will not be inferred from this that defendant deliberately formed an intent to relinquish its redress under the insurance policy, and in connection therewith it is specifically found that Titan at no time acquiesced in Good Deal's continued possession of the proceeds.
It is noted that plaintiff makes no claim of waiver arising out of a contract based upon valuable consideration.
The claim of waiver cannot prevail.
The claim of laches is equally without merit. Laches is an equitable defense. The party urging its application must show that his adversary, without explanation or excuse, delayed in asserting a claim now stale, that the delay was unreasonable under the circumstances, and that it "visited prejudice upon the party asserting the delay." Mitchell v. Alfred Hoffmann, Inc., 48 N.J. Super. 396, 403 (App. Div. 1958), certif. den. 26 N.J. 303 (1958). See also, West Jersey Title, etc., Co. v. Industrial Trust Co., supra 27 N.J. at 153; Markey v. Bayonne, 24 N.J. Super. 105, 118 (App. Div. 1958); Riverton Country Club v. Thomas, 141 N.J. Eq. 435, 448 (Ch. 1948), aff'd 1 N.J. 508 (1948); Stroebel v. Jefferson Trucking & Rigging Co., 125 N.J.L. 484, 487 (E. & A. 1940).
Laches involves more than mere delay, mere lapse of time. To deserve that category, the delay must be for a length of time which, unexplained and unexcused, is altogether unreasonable under the circumstances, and has been prejudicial to the party asserting it or renders it very doubtful that the truth can be ascertained and justice administered." Stroebel v. Jefferson Trucking & Rigging Co., 125 N.J.L. 484, 487 (E. & A. 1940). "The mere passage of time, of course, does not constitute laches." Finley v. United States, 130 F. Supp. 788, 796 (D.C.D.N.J. 1955). "It is Hornbook law that laches consists of two elements: Inexcusable delay in commencing a suit and prejudice to the respondent resulting from such delay. The Court should consider the equities of the case and not rely merely upon the lapse of time." Id. supra, at 794.
Where no one has been misled to his harm in any legal sense by the delay, and the situation has not materially changed, the delay is not fatal. Laches in legal significance, is not mere delay, but delay that works a disadvantage to another. So long as parties are in *490 the same condition, it matters little whether one presses a right promptly or slowly, within limits allowed by law; but when, knowing his rights, he takes no steps to enforce them until the condition of the other party has, in good faith, become so changed that he cannot be restored to his former state, if the right be then enforced, delay becomes inequitable and operates as an estoppel against the assertion of that right. [2 Pomeroy's Equity Jurisprudence (5th ed. 1941), § 419(d) at 177-79]
And see 19 Am. Jur. Equity, § 498 at 343-344; Hinners v. Banville, 114 N.J. Eq. 348, 357 (E. & A. 1933); Gahn v. Gahn, 30 N.J. Super. 427, 430 (Ch. 1954); Hill Dredging Corp. v. Risley, 18 N.J. 501, 537 (1955); Johnston v. McKenna, 76 N.J. Eq. 217, 229 (Ch. 1909), aff'd 77 N.J. Eq. 555 (E. & A. 1910); Farr v. Hauenstein, 69 N.J. Eq. 740, 742 (Ch. 1905); Holzer v. Thomas, 69 N.J. Eq. 515, 521 (Ch. 1905).
Perhaps if Titan had perceived and acted upon Good Deal's deceptions earlier than it did, plaintiff might also have sooner moved into action. But it is not at all clear what success this would have had. When Titan learned Good Deal had received the settlement draft, the instrument had already been paid. Even had Titan's notice of that occurrence been instantaneously transmitted to plaintiff, plaintiff's position would have been no better that it was at any later time. In any event, plaintiff actually discovered its own mistake within a week or ten days after notice was received by Titan, and its representatives were already studying the possible consequences of their error. When they spoke with Aidekman he frankly told them that he would not return the money and that he would not provide them with indemnification. Having made a gargantuan error, and with unmistakable evidence before them of Good Deal's intention to retain its benefits, plaintiff nevertheless temporized and made fruitless telephone calls and meaningless written requests for indemnification. It failed to open talks with defendants and remained essentially inert. If Titan was irresolute, it was because they were under the spell of Aidekman's siren song. He was a member of the bar dealing with other lawyers and they *491 had no reason to assume that he would dishonor himself as he did. But no such explanation can be found for plaintiff's failure to act. It knew what it was facing, and after weighing its options chose to sit back and gamble on the chance that time would favorably transform the situation. The initiative clearly lay with plaintiff, not with its loss payees as to whom it had been delinquent, and the rule applies that when both parties are at fault in contributing to delay, neither can assert laches against the other. Mitchell v. Alfred Hoffmann, Inc., supra 48 N.J. Super. at 403; 30A C.J.S. Equity § 114 at 34; 27 Am. Jur.2d Equity, § 154 at 690. Whatever delay occurred caused no prejudice to plaintiff and resulted at least in part from plaintiff's acquiescence and contributions thereto.
Plaintiff's final defense under the policy is addressed to the failure to designate Titan in the policy as owner, not as mortgagee. The erroneous description, however, constitutes neither a legal nor an equitable impediment to recovery. The recital of the loss payees' names "as their interest may appear" forms notice to and recognition by the insurer of Titan's interest in the property, whatever it might be. Commercial Union Fire Ins. Co. v. Marshall, 18 F.2d 457, 458 (6 Cir.1927), cert. den. 274 U.S. 760, 47 S.Ct. 769, 71 L.Ed. 1338 (1927); Firemen's Ins. Co. v. Brooks, 32 F.2d 451, 452 (6 Cir.1929).
Plaintiff's contention that if Titan had been correctly shown on the policy as owner, it would have properly allocated the proceeds thereunder to each of the assureds under the various coverages provided, has also been considered. But whether the insurer by whose awesome misfeasance these circumstances were created would have been any more fastidious in its attention to detail under the hypothesized facts than under the facts presented is not indicated by the evidence and is a speculation we will not pursue. In either case defendants' right to payment is the same, and the central unalterable fact is that the right has not been satisfied.
*492 Plaintiff's request for an assignment of the Howard mortgage upon payment of that defendant's claim is bottomed upon the standard mortgagee clause contained in the policy which, so far as applicable, provides:
Whenever the Company shall pay the mortgagee (or trustee) any sum for loss under this policy and shall claim that, as to the mortgagor or owner, no liability therefor existed, the Company shall, to the extent of such payment, be thereupon legally subrogated to all the rights of the party to whom such payment shall be made, under all securities held as collateral to the mortgage debt, or may at its option pay to the mortgagee (or trustee) the whole principal due or to grow due on the mortgage with interest accrued and shall thereupon receive a full assignment and transfer of the mortgage and of all such other securities; but no subrogation shall impair the right of the mortgagee (or trustee) to recover the full amount of said mortgagee's (or trustee's) claim.
Plaintiff argues that the foregoing clause entitled it to an assignment of the mortgage since it enjoys a policy defense against Suss Leaf, the original mortgagor. Its purpose is to capitalize on the unique circumstance that the mortgagor, Suss Leaf, is not insured under the policy although the owner, Titan, is. Plaintiff's position is that its right to assignment of the mortgage is disjunctively conditioned upon its nonliability to either the mortgagor "or" the owner, and it may therefore proceed on the mortgage even though at the expense of the owner to whom it is fully liable under the policy. The novel question presented is whether the mortgagee clause should be read so literally as to permit the result argued for.
That the insurer is entitled under this provision to an assignment of mortgage instruments upon settlement of the mortgagee's loss where there is no liability under the policy to the "mortgagor or owner" is settled. 44 Am. Jur.2d, Insurance, § 1833; 46 C.J.S. Insurance § 1209 at 156; Appleman, Insurance Law and Practice, § 4072 (1972); Lawrence v. Union Ins. Co., 80 N.J.L. 133, 135 (Sup. Ct. 1910). Were the rule otherwise the uninsured mortgagor or owner would, in the event of loss, receive the gratuitous *493 benefit of a mortgage reduction without having borne his fair share of the cost of coverage. Here, no gratuitous benefit is involved since the owner was covered and the mortgagor had no interest in the property. But the question remains whether, under the language of the clause and the facts presented, the separate identities of owner and mortgagor should allow foreclosure of the mortgage by the insurer.
It does not appear that the relief requested is necessary to advance the underlying purpose of the clause in this case. Titan was named as a loss payee on the policy and the building was fully insured to the extent of $310,000, well in excess of the mortgage balance, approximately $110,000 at the time of the fire. The phrase, "mortgagor or owner," was chosen by the insurance carrier and it should not be read so as to allow a carrier to enjoy the benefit of a windfall from this chance separateness of mortgagor and owner, absent any evidence of unfair dealing on the part of the insured. The language of the clause has elsewhere been liberalized to permit a more equitable construction than its strict terms required. In Loewenstein v. Queen Ins. Co., 227 Mo. 100, 127 S.W. 72 (Sup. Ct. 1910), the court observed that as to that part of the clause reading, "Whenever this company * * * shall claim that, as to the mortgagor or owner, no liability therefor existed * * *," etc. (emphasis supplied):
Literally it means that, when the company pays the debt, if it should claim that it is not liable to the mortgagor, then it is not liable. [at 76]
On that basis the cited language was read to require proof of such nonliability and it was held that the insurer's mere "claim" thereof was not sufficient.
It is a cardinal rule in the construction of contracts and statutes that the conjunctions "and" and "or" are frequently used interchangeably, Tunkel v. Filippone, 4 N.J. Super. 107, 110 (App. Div. 1949); Howard v. Harwood's Restaurant Co., 25 N.J. 72, 88 (1957); Chicago *494 Land Clearance Comm'n v. Jones, 13 Ill. App.2d 554, 142 N.E. 2d 800, 803 (App. Ct. 1957); 3 Corbin On Contracts, § 542 at 126-127, n. 85.25 (1960); 17 Am. Jur.2d, Contracts, § 283; 1A Sutherland, Statutory Construction (4th ed. 1972), § 21.14. Under the circumstances of this case the phrase "mortgagor or owner" will be read to contemplate that the owner and the mortgagor are one and the same as "mortgagor and owner." A more literal reading of the phrase would be incompatible with the equities presented. Consistently therewith, defendant Titan, the owner who took title to the building subject to the mortgage, who was bearing responsibility for mortgage payments since 1960, and who even since the date of the fire reduced the mortgage balance by some $20,000, will be regarded for the purposes hereof as the owner and equitable mortgagor.
The conclusion herein formulated appears to conform with the reasoning of the court and the result reached in United Stores of America, Inc. v. Firearm's Fund Ins. Co., 420 F.2d 337 (8 Cir.1970). There, under a net-net lease the lessee of a department store building procured fire insurance policies in which it was named as the insured and in which the mortgagee was named as a loss payee. Omitted entirely from the policies were the names of the owners-lessors who were also the mortgagors. Following settlement of a fire loss the carrier paid the mortgagee and thereafter sought to exercise its subrogated rights under the mortgage. In the view of the court the essential question was "whether the insurance policies were procured for the benefit of the lessor-mortgagor." If so, it reasoned, no right of foreclosure accrued to the insurer. It was categorically stated that "the mere fact that the policy does not name the owner or mortgagor as an insured is not alone sufficient to entitle the insurer to subrogation." The allowance of subrogation appears to be governed by whether the policy was obtained for the sole benefit of the mortgagees or for the benefit of others. The consequence ensuing upon that determination are delineated by the court (at 340) in the following *495 language which the court finds persuasive in the case at hand:
Where, as here, the policyholder does not acquire the fire insurance for the sole benefit of the mortgagee and the mortgagee neither procures the issuance of the insurance nor pays the premiums, acceptance of those insurance proceeds by the mortgagee after a loss carries with it the concomitant obligation to apply them for the purpose or purposes for which the policyholder obtained the coverage. In this case, those purposes are satisfied by the application of the proceeds to reduce the mortgage indebtedness. This application extinguishes the mortgage indebtedness to the extent of the payment to the mortgagee and nothing further remains of that part of the indebtedness which can be assigned to the insurer pursuant to its subrogation clause.
An order for judgment should be presented denying plaintiff's claim for relief in all respects and entering judgment on the counterclaim in favor of counterclaimants Titan Supermarket Associates and Howard Savings Institution jointly in the amount of $200,682.82, either consented to as to form or on five days' notice.