**CHEMICAL LEAMAN TANK LINES, INC., Plaintiff,**

v.

**AETNA CASUALTY AND SURETY CO., Robin Anthony Gildart Jackson, an Underwriter at Lloyds, London, et al., Defendants.**

Civ. A. No. 89–1543 (SSB).

United States District Court, D. New Jersey.

March 12, 1993.

As Amended March 16, 1993.

Stuart M. Feinblatt, Philip A. Bramson,
Sills Cummis Zuckerman Radin Tischman

Epstein & Gross, Newark, NJ, Kevin B. Clark, Willkie Farr & Gallagher, Washington, DC, for plaintiff Chemical Leaman Tank Lines, Inc.

Peter E. Mueller, and Brian J. Coyle, Harwood Lloyd, Hackensack, NJ, for defendant Aetna Cas. & Sur. Co.

William J. Hanley, Ronca McDonald & Hanley, Livingston, NJ, Henry Lee, Hannah O'Driscoll, Mendes & Mount, New York City, for defendants Robin Anthony Gildart Jackson, et al.

## TABLE OF CONTENTS

I. Introduction . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1140
   A. Background and Procedure . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1140
   B. The Insurance Policies . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1141
      1. Aetna's Comprehensive General Liability Policies . . . . . . . . . . . . . . . . . 1141
      2. LMI's Excess and Umbrella Policies . . . . . . . . . . . . . . . . . . . . . . . . . . . 1142
   C. Standard for Summary Judgment . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1143

II. The Expected/Intended Clause . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1143
   A. Legal Issues . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1143
      1. Burden of Proof . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1143
      2. Objective or Subjective Intent . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1145
   B. Aetna's Motion for Summary Judgment on Its Pre–1961 "Accident"–
      Based Policies . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1147
   C. The Parties' Cross–Motions for Summary Judgment on the Expect-
      ed/Intended Issue . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1148
      1. Chemical Leaman's Evidence . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1149
      2. Defendants' Evidence . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1149
      3. Conclusions . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1150

III. Continuous Trigger Theory . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1152

IV. Pollution Exclusion Clause . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1154
   A. The Broadwell Line of Cases . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1154
   B. The Ambiguous Meaning of the "Sudden and Accidental" Exception . . . . 1155
   C. Contra Proferentum vs. "Sophisticated Insured" . . . . . . . . . . . . . . . . . . . . 1155
   D. The Parties' Cross–Motions for Summary Judgment . . . . . . . . . . . . . . . . . . 1156

V. Owned–Property Exclusion . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1157

VI. Late Notice . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1157
   A. Substantial Rights Irretrievably Lost . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1158
   B. Likelihood of Success in Defending the Underlying Claim . . . . . . . . . . . . 1159

VII. Failure to Cooperate . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1160

VIII. Aetna's Duty to Defend . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1160
   A. Pre–Notice Defense Costs . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1160
   B. Post–Notice Defense Costs . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1161

IX. Conclusion . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1162

---

## OPINION

BROTMAN, District Judge.

Presently before the court are the cross-motions for summary judgment of plaintiff Chemical Leaman Tank Lines, Inc. ("Chemical Leaman"), defendant Aetna Casualty and Surety Co. ("Aetna"), and the London market insurers Robin Anthony Gildart Jackson, et al. ("LMI"). The parties raise a plethora

of legal and factual issues for the court's resolution.

## I. Introduction

### A. *Background and Procedure*

In this diversity action, Chemical Leaman seeks a declaratory judgment that defendant Aetna must provide coverage under certain comprehensive general liability ("CGL") policies and that LMI must provide coverage under certain umbrella and excess liability insurance policies for environmental costs connected to the environmental cleanup of Chemical Leaman's Bridgeport, New Jersey, facility.

Chemical Leaman is a tank truck company specializing in the transportation of various chemicals and other liquids. Chemical Leaman used the Bridgeport site from at least 1960 to 1985 to clean trucks. From 1960 to 1969, Chemical Leaman placed contaminated rinsewater at its Bridgeport facility into a wastewater treatment system consisting of unlined ponds and lagoons. In 1969, the New Jersey Department of Health responded to community complaints about bad odors and ordered Chemical Leaman to construct a wastewater treatment and/or disposal plant. Chemical Leaman continued to use the pond and lagoons system until 1975, when it installed a water treatment system. By 1977, Chemical Leaman had drained the ponds and lagoons of liquid, dredged the accumulated sludge out of the lagoons, and filled all the ponds and lagoons with brickbat, sand, and concrete.

In 1981, the New Jersey Department of Environmental Protection ("DEP") ordered Chemical Leaman to investigate the extent and degree of groundwater contamination at and around the Bridgeport site. The investigation revealed that the ponds and lagoons were the primary source of groundwater contamination. In 1984, the federal Environmental Protection Agency ("EPA") placed the site on the Superfund national priorities list pursuant to section 105 of the Comprehensive Environmental Response, Compensation and Liabilities Act ("CERCLA"). 42 U.S.C. § 9605. The EPA alleged that Chemical Leaman is strictly liable for damages and cleanup costs resulting from the onsite con-

tamination. In July 1985, Chemical Leaman entered into a consent order with the EPA. Chemical Leaman admitted liability under CERCLA and agreed to undertake a Remedial Investigation and Feasibility Study ("RI/FS") of the groundwater. Chemical Leaman incurred expenses in performing the RI/FS and is further obligated to pay for all costs of removal or remedial action incurred by the United States or the state of New Jersey, as well as for damages for injury to, destruction of, or loss of natural resources.

On or about April 18, 1988, Chemical Leaman gave notice to Aetna of claims under its applicable CGL policies. On or about March 30, 1989, Chemical Leaman notified LMI. The defendants have refused to defend or indemnify Chemical Leaman for costs already incurred or to be incurred in the future in connection with the cleanup of the Bridgeport site. Chemical Leaman filed the present suit on April 12, 1989. The court understands plaintiff's claims to be limited to coverage for its liabilities resulting from the EPA's suit under CERCLA.

On March 31, 1992, the court granted partial summary judgment in favor of Chemical Leaman on the following issues:

1. New Jersey law governs the construction and interpretation of all the insurance policies involved in the litigation;

2. The cleanup costs which Chemical Leaman is obligated to pay pursuant to CERCLA with respect to ground and surface water contamination in the vicinity of, but not at, the Bridgeport site constitute property damages under the insurance policies;

3. The "owned property exclusion" does not apply to Chemical Leaman's remedial measures that are designed to correct injury or to prevent further injury to the ground and surface waters in the vicinity of the Bridgeport site.

The court also refused to grant summary judgment in favor of defendants on the issue of coverage for contamination occurring after the date Chemical Leaman received notice from the New Jersey DEP of the extent of the groundwater contamination. *Chemical*

*Leaman Tank Lines, Inc. v. Aetna Casualty & Sur. Co.,* 788 F.Supp. 846 (D.N.J.1992).

Presently before the court are the various motions of the parties for summary judgment. On November 23, 1992, the court held oral argument on these motions and reserved its decision. Trial is scheduled to commence on March 15, 1993.

## B. *The Insurance Policies*

### 1. Aetna's Comprehensive General Liability Policies

■. Chemical Leaman purchased comprehensive general liability insurance ("CGL") from Aetna covering successive years, from April 1, 1959 through April 1, 1985. Pl.'s 12G Statement ¶ 4.[1] These comprehensive liability policies were standard form insurance agreements utilized by Aetna and some other insurance companies throughout the period 1960–1985. Chemical Leaman played no role in drafting or negotiating the terms of these policies. Joint Final Pretrial Order ¶ IV.5.

*April 1, 1959—April 1, 1961 Aetna Policies*

From April 1, 1959 through April 1, 1961, Aetna insured Chemical Leaman under its 1955 standard policy form. Pursuant to the terms of the policies in effect during this period, Aetna agreed to pay on behalf of Chemical Leaman:

> all sums which the Insured shall become legally obligated to pay as damages because of injury to or destruction of property, including the loss of use thereof, caused by accident.

The policy did not define the term "accident." Pl.'s 12G Statement ¶ 5. The policies obligated Aetna to

> defend any suit against the Insured alleging such injury, sickness, disease or destruction and seeking damages on account

thereof, even if such suit is groundless, false, or fraudulent.

Pl.'s 12G Statement ¶ 6.

*April 1, 1961—April 1, 1967 Aetna Policies*

From April 1, 1961 through April 1, 1967, Aetna continued to insure Chemical Leaman under its 1955 standard policy form. However, these policies substituted the word "occurrence" for the word "accident." An "occurrence" was defined as:

> an event which causes injury during the policy period or a continuous or repeated exposure to conditions which results in injury to persons or tangible property during the policy period, if such injury is neither expected nor intended by the insured.

Pl.'s 12G Statement ¶ 7.

*April 1, 1967–April 1, 1973 Aetna Policies*

From April 1, 1967 through April 1, 1973, Aetna insured Chemical Leaman under its 1966 standard policy form. Pursuant to the terms of these policies, Aetna agreed to pay on behalf of Chemical Leaman:

> all sums which the insured shall become legally obligated to pay as damages because of bodily injury or property damage to which this insurance applies, caused by an occurrence.

The policies defined an "occurrence" as:

> an accident, including injurious exposure to conditions, which results, during the policy period, in bodily injury or property damage neither expected nor intended. from the standpoint of the insured.

The policies defined the term "property damage" as "injury to or destruction of tangible property." Pl.'s 12G Statement ¶ 9. Pursuant to the terms of these policies, Aetna also agreed to:

> defend any suit against the insured seeking damages on account of such bodily injury or property damage, even if any of

---

1. LMI moves to strike Chemical Leaman's summary judgment motion on the ground that plaintiff's 12G Statement of Material Facts Not in Dispute is devoid of references to the record.

While the court certainly prefers that a 12G Statement contain citations to the record, nothing in Local Rule 12G requires it. LMI's motion is therefore denied.

the allegations of the suit are groundless, false or fraudulent. Pl.'s 12G Statement ¶ 10.

*April 1, 1973—April 1, 1985 Aetna Policies*

From April 1, 1973 through April 1, 1985, Aetna insured Chemical Leaman under its 1973 standard policy form. These policies obligated Aetna to pay:

all sums which the insured shall become legally obliged to pay as damages because of bodily injury or property damage to which this insurance applies, caused by an occurrence.

The policies defined an "occurrence" as:

an accident, including continuous or repeated exposure to conditions, which results in bodily injury or property damage neither expected nor intended from the standpoint of the insured.

The term "property damage" was defined in these policies as:

(1) physical injury to or destruction of tangible property which occurs during the policy period, including the loss of use thereof at any time resulting therefrom, or (2) loss of use of tangible property which has not been physically injured or destroyed provided such loss of use is caused by an occurrence during the policy period.

Pl.'s 12 Statement ¶ 13. Aetna also agreed to:

defend any suit against the insured seeking damages on account of such bodily injury or property damage, even if any of the allegations of the suit are groundless, false or fraudulent.

Pl.'s 12G Statement ¶ 14.

*Pollution Exclusion Clause*

From April 1, 1971 through April 1, 1985, Aetna's policies contained a pollution exclusion clause, which stated:

It is agreed that the insurance does not apply to bodily injury or property damage arising out of the discharge, dispersal, release or escape of smoke, vapors, soot, fumes, acids, alkalis, toxic chemicals, liquids or gases, waste materials or other irritants, contaminants or pollutants into or upon land, the atmosphere or any watercourse or body of water; but this exclusion does not apply if such discharge, dispersal, release or escape is sudden and accidental.

Pl.'s 12G Statement ¶¶ 11, 15.

*Notice of Claim Provisions*

Each insurance policy issued by Aetna to Chemical Leaman from April 1, 1959 through April 1, 1985, provided that in the event of an accident or occurrence, "written notice … shall be given by or for the insured to the company or any of its authorized agents as soon as practicable." Pl.'s 12G Statement ¶ 16. The insurance policies also provided that "[i]f claim is made or suit is brought against the insured, the insured shall immediately forward to the company every demand, notice, summons or other process received by him or his representative." Pl.'s 12G Statement ¶ 17.

*Cooperation Provisions*

Each insurance policy issued by Aetna to Chemical Leaman from April 1, 1959 through April 1, 1985, provided that the insured shall cooperate with Aetna and generally, among other things, assist in making settlements, in the conduct of suits, in securing and giving evidence and in obtaining the attendance of witnesses. Pl.'s 12G Statement ¶ 18.

### 2. LMI's Excess and Umbrella Policies[2]

*April 1, 1958–April 1, 1985 LMI Excess and Umbrella Policies[3]*

Pursuant to the terms of each excess insurance policy issued by LMI to Chemical Leaman for the period April 1, 1958 through April 1, 1985, LMI agreed to provide the same basic coverage as issued by Aetna.[4]

---

**2.** For a discussion of how the London insurance market operates, see *Diamond Shamrock Chemicals v. Aetna Casualty & Sur. Co.,* 258 N.J.Super. 167, 189–90, 609 A.2d 440 (App.Div.1992).

**3.** At oral argument, Chemical Leaman dismissed any claims it had against LMI on the policy running from April 1, 1985 to April 1, 1986. Tr. of Oral Argument at 27.

**4.** Chemical Leaman states in its 12G Statement

The LMI policies also included substantially the same notice and duty to cooperate provisions as found in the policies issued by Aetna.

*April 1, 1971—April 1, 1985 Pollution Exclusion Clauses*

Each LMI insurance policy in effect from April 1, 1971 to April 1, 1985, contain a pollution exclusion clause. The LMI policies in effect from April 1, 1971 to April 1, 1974, and from April 1, 1977 to April 1, 1985, exclude coverage for damage "caused by seepage, pollution or contamination," unless "such seepage, pollution or contamination is caused by a sudden, unintended and unexpected happening during the period of this insurance." LMI 12G Counterstatement ¶ 29. The LMI policies in effect from April 1, 1974 to April 1, 1977, contain a pollution exclusion clause identical to the one contained in the relevant Aetna policies.

## C. Standard for Summary Judgment

The standard for summary judgment is a stringent one. A court may grant summary judgment only when the materials of record show that no genuine issue exists as to any material fact and that the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c); *Tudor Dev. Group, Inc. v. United States Fidelity & Guar. Co.*, 968 F.2d 357, 359–60 (3d Cir.1992). In deciding whether there is a disputed issue of material fact, the court must resolve doubts in favor of the non-moving party. *Desvi, Inc. v. Continental Ins. Co.*, 968 F.2d 307, 308 (3d Cir. 1992). The threshold inquiry is whether there are "any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250, 106 S.Ct. 2505, 2511, 91 L.Ed.2d 202 (1986).

A motion for summary judgment must be granted if the party opposing the motion "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986). If the moving party carries its burden of establishing the absence of a genuine issue of material fact, then the non-moving party "must do more than simply show that there is some metaphysical doubt as to material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586, 106 S.Ct. 1348, 1355, 89 L.Ed.2d 538 (1986). Thus, if the non-movant's evidence is merely "colorable" or is "not significantly probative," the court may find that the material facts are not in genuine dispute and adjudicate the matter in accordance with the substantive law. *Anderson*, 477 U.S. at 249–50, 106 S.Ct. at 2510–11. Finally, if summary judgment is denied, the court may, in the course of deciding the motion, "ascertain what material facts exist without substantial controversy" and deem these facts as established for trial. Fed.R.Civ.P. 56(d).

## II. The Expected/Intended Clause

### A. Legal Issues

#### 1. Burden of Proof

The parties dispute who bears the burden of proof for establishing whether or not the alleged coverable damages caused by Chemical Leaman were "expected or intended." The applicable rules of New Jersey law are clear. The party seeking coverage bears the burden of bringing its claim within the basic terms of the insurance policy. *Hartford Accident & Indem. Co. v. Aetna Life & Casualty Ins. Co.*, 98 N.J. 18, 26, 483 A.2d 402 (1984). However, it is the insurer that carries the burden of proving that the loss comes within a policy exclusion. *Burd v. Sussex Mut. Ins. Co.*, 56 N.J. 383, 399, 267 A.2d 7 (1970). The defendants read the ex-

---

that LMI's policies essentially "followed form" to Aetna's primary policy. LMI makes a point of disagreeing with this statement, and sets out all the relevant policy terms of LMI's excess and umbrella policies from 1958 to 1985. However, with the exception of its pollution exclusion clauses, LMI does not argue anywhere in its briefs that this court should interpret the basic coverage and exclusions under the LMI policies differently from those under Aetna's policies. In the absence of such an argument, and upon review of the LMI policy terms, the court finds that coverage under LMI's and Aetna's policies is identical for the purposes of the legal issues addressed in this opinion, unless otherwise noted.

pected/intended clause as part and parcel of the basic grant of insurance coverage. Chemical Leaman, on the other hand, argues that the expected/intended clause is an exclusion, thereby placing the burden of proof on the defendants.

■ The New Jersey Supreme Court described the "basic coverage" provided by policies like the ones in the case at bar as the carrier's obligation to "pay on behalf of the insured all sums which the insured shall become legally obliged to pay as damages because of bodily injury . . . to which this insurance applies, caused by an occurrence." *Hartford v. Aetna*, 98 N.J. at 27, 483 A.2d 402. It is, thus, beyond dispute that the insured must prove an occurrence in order to obtain coverage. After 1961, Chemical Leaman's policies with defendants contained clear definitions of an occurrence—namely, "an accident or event which results in property damage neither expected nor intended from the standpoint of the insured." The court finds that this entire definition of occurrence constitutes the grant of basic coverage provided under defendants' insurance policies, and that the insured bears the burden of proving all of the definition's elements, including the expected/intended clause.

Plaintiff would have the court sever this definition of occurrence into two parts. The first part would provide the basic grant of coverage for any accident or event which results in property damage. The second part would operate to exclude a certain category of events resulting in property damage, namely those that are expected or intended by the insured. Dividing the definition into two parts like this, however, is not a reasonable or commonsensical reading. The policies clearly and unambiguously indicate that the full sentence comprises the definition of an occurrence. There is no indication from the language of the definition or from the surrounding context that the policy limits either basic coverage or the definition of occurrence to the first part of the sentence

only. Moreover, the court is unable to imagine, and plaintiff has failed to suggest, an alternative phrasing that more clearly and unambiguously incorporates the concept of unintended and unexpected damages into the definition of occurrence.[5] The court finds that the only reasonable reading of the policy is that the intended/expected concept is constitutive of the definition of occurrence. Therefore, plaintiff bears the burden of proof on this issue.

■ Chemical Leaman presents several arguments in support of the proposition that the expected/intended clause is an exclusion. It first points out that the insurance carriers originally drafted the expected/intended clause as an exclusion, but then decided to incorporate the clause into the definition of an occurrence. *See* Pl.'s Br. at 12; *see also* Aetna's Br. at 19 & n. 40. However, New Jersey law provides that "an insurance policy should be interpreted according to its plain and ordinary meaning." *Voorhees v. Preferred Mut. Ins. Co.*, 128 N.J. 165, 179, 607 A.2d 1255 (1992). The insurance policies' drafting history is, therefore, irrelevant where, as here, the court finds the policy language to be clear and unambiguous. *See Longobardi v. Chubb Ins. Co. of New Jersey*, 121 N.J. 530, 537, 582 A.2d 1257 (1990).

Plaintiff also cites to cases that describe the expected or intended clause as an "exclusion." *See J.T. Baker, Inc. v. Aetna Casualty & Sur. Co.*, 135 F.R.D. 86, 90 (D.N.J.1989); *Ambassador Ins. Co. v. Montes*, 76 N.J. 477, 490–92, 388 A.2d 603 (1978) (Pashman, J., concurring); *Lyons v. Hartford Ins. Group*, 125 N.J.Super. 239, 245–47, 310 A.2d 485 (App.Div.1973), *certif. denied*, 64 N.J. 322, 315 A.2d 411 (1974). None of these decisions, however, uses this language in deciding the precise issue now before this court— that is, the burden-of-proof structure under liability policies that provide coverage only for damages neither expected nor intended by the insured. *J.T. Baker* was a discovery

---

5. For example, the policy could have defined an occurrence as "an accident or event which results in unintended and unexpected property damage from the standpoint of the insured." But the meaning of this language is virtually indistinguishable from the actual policy language. Both versions use the expected/intended concept to define the kind of damages that are covered. The difference is one of syntax, not meaning. A reasonable person would find no difference between the two sentences.

case. The specific issue before the court was not which party bears the burden of proof but rather whether the insured's intent should be evaluated from an objective or subjective viewpoint. 135 F.R.D. at 88, 90–92. Similarly, Justice Pashman in his concurrence in *Montes* addressed not the burden of proof issue but rather whether the intent inquiry should focus on the insured's intent to commit a wrongful act or on her intent to cause the resulting damages. 76 N.J. at 490–92, 388 A.2d 603. Finally, in *Lyons*, the court construed an expected/intended clause that did, in fact, appear as an explicit policy exclusion. 125 N.J.Super. at 244, 310 A.2d 485. In sum, plaintiff cites no case applying New Jersey law that characterizes the expected/intended clause as an exclusion for the purpose of determining who bears the burden of proof.

A final concern informs this court's holding that the expected/intended clause is constitutive of the basic grant of coverage under defendants' liability policies. Plaintiff's proposed reading of the expected/intended clause presupposes that a liability policy may cover not only unintended damages caused by intentional acts but *intended* damages as well. However, just as "[o]ne cannot obtain insurance for a risk that the insured knows has already transpired," *Gloucester Township v. Maryland Casualty Co.*, 668 F.Supp. 394, 403 (D.N.J.1987), the New Jersey Supreme Court has stated that public policy favors "[t]he exclusion of intentional injury from coverage" in order to prevent individuals from inflicting damage because they know they will be insured. *Voorhees v. Preferred Mut. Ins. Co.*, 128 N.J. 165, 181, 607 A.2d 1255 (1992) (quoting *Burd v. Sussex Mut. Ins. Co.*, 56 N.J. at 398–99, 267 A.2d 7). Plaintiff's proposed reading of the policy stands in potential conflict with this underlying concern.

## 2. Objective or Subjective Intent

As ruled above, plaintiff, as part of its case for proving that its losses fall within the basic coverage of its insurance policies with defendants, bears the burden of establishing that Chemical Leaman neither expected nor intended to contaminate the soil and groundwater at the Bridgeport site. The parties, however, disagree on the standard for evaluating Chemical Leaman's intentions. Underlying this dispute is the well established distinction between (1) the intent of the insured in performing the acts that cause damage and (2) the intent of the insured in causing the damage itself. *See Voorhees v. Preferred Mut. Ins. Co.*, 128 N.J. 165, 181–83, 607 A.2d 1255 (1992). Tort law focuses on the first kind of intent. An individual who intentionally performs a particular act will be liable for damage caused by the act, so long as this damage is a foreseeable and probable result. In contrast, insurance law generally focuses on the second kind of intent.[6] An insured who intentionally performs an act that causes damage may be entitled to coverage, so long as the insured did not intend to cause the damage. In other words, a carrier may be held liable for coverage for the unintentional result of an insured's intentional act. *See Lyons v. Hartford Ins. Group*, 125 N.J.Super. 239, 247, 310 A.2d 485 (App.Div.1973), *certif. denied*, 64 N.J. 322, 315 A.2d 411 (1974). In line with these principles, the intent inquiry in the present case focuses not on Chemical Leaman's intent to place contaminated water in ponds and lagoons at the Bridgeport site, but rather on Chemical Leaman's intent to cause

---

6. It is, of course, true that the meaning of "expected and intended" in an insurance policy depends in the first instance on the language of the policy and principles of contract interpretation. There are, however, important reasons for construing the intent required to preclude coverage as the intent to cause damage rather than intent to perform the acts that cause damage. As the court in *J.T. Baker v. Aetna Casualty and Sur. Co.* observed:

> Insurance is purchased and premiums are paid to indemnify the insured for damages caused by accidents, that is, for conduct not meant to

cause harm but which goes awry. The insured may be negligent, indeed, in failing to take precautions or to foresee the possibility of harm, yet insurance coverage protects the insured from his own lack of due care. If the policy holder were to be told that the words of the "occurrence" definition excluding coverage for "expected or intended" damages actually mean that coverage is also lost for damage which a prudent person "should have" foreseen, there would be no point to purchasing a policy of liability insurance.

135 F.R.D. 86, 92 (D.N.J.1989).

the resulting soil and groundwater damage which it is now obligated to remediate.

The parties dispute whether the inquiry into Chemical Leaman's intent is a subjective or objective one. The New Jersey Supreme Court has recently and clearly addressed this issue. The general rule requires an evaluation of "the insured's subjective intent to determine intent to injure." *Voorhees,* 128 N.J. at 185, 607 A.2d 1255. However, where "exceptional circumstances" are present that "objectively establish the insured's intent to injure," the trier of fact may presume the insured's intent "from the act without an inquiry into the actor's subjective intent." *Id.* at 184, 607 A.2d 1255. These exceptional cases arise when the insured's "actions are particularly reprehensible." *Id.* at 185, 607 A.2d 1255.

■ Defendants ask this court to invoke the *Voorhees* particularly-reprehensible-act exception and to mandate an objective inquiry. Under this standard, the trier of fact may presume from an insured's intentional acts which cause damage that the insured intended to cause the particular resulting damage. The Supreme Court in *Voorhees* identified the case of sexual abuse of children in a day-care center as a paradigm example of presuming the insured's subjective intent to cause a particular kind of damage from the insured's intent to perform the acts that cause that damage. 128 N.J. at 184–85, 607 A.2d 1255 (citing *Atlantic Employers v. Tots & Toddlers Pre–School Day Care Center,* 239 N.J.Super. 276, 571 A.2d 300 (App.Div.), *certif. denied,* 122 N.J. 147, 584 A.2d 218 (1990)). As the court observed, "sexual assault of children is so inherently injurious that it can never be an accident." *Id.* 128 N.J. at 185, 607 A.2d 1255.

■ Thus, this court must address whether Chemical Leaman's acts at the Bridgeport site were so reprehensible as to require a presumption that Chemical Leaman expected or intended to cause the groundwater and soil damage. Defendants claim that Chemical Leaman's "design and implementation of an unlined lagooning system at the Bridgeport Terminal" represent an example of particularly reprehensible and egregious behavior. LMI's Reply Br. at 8; *see also* Aetna's

Br. at 15. But the crux of their argument is that "Chemical Leaman *knew* that their unlined lagoons would cause groundwater contamination." LMI's Reply Br. at 14 (emphasis added). While the facts underlying this proposition may succeed in excluding coverage by proving that Chemical Leaman expected or intended to cause groundwater and soil damage, they fail in the present context to establish that Chemical Leaman's behavior was particularly reprehensible.

The central issue in this litigation is whether Chemical Leaman knew that its Bridgeport rinsewater treatment system was so inadequate that its use would result in harm to the environment. The record, however, contains abundant evidence that Chemical Leaman designed and built the facility to prevent this result. *E.g.* McLane Report at 2–3, Pl.'s App.Ex. 17; Elston Dep. at 132, 137, 214; Ford Dep. at 192; Middleton Dep. at 85. In addition, there is testimony that other companies with similar wastewater treatment problems used unlined ponds and lagoons. *See* Middleton Dep. at 105–06; Ford Dep. at 315. The rinsewater treatment system was more than a "series of holes in the ground." Rather, it represented Chemical Leaman's attempt, however flawed, at waste disposal.

This fact distinguishes the present case from *Morton International v. General Accident Ins. Co. of Am.,* No. A–895–89T3, 1991 WL 348049 (N.J.Super.App.Div. Oct. 2, 1991). There the Appellate Division granted summary judgment to the defendant insurance companies based on the objective approach. The insured in *Morton International* allowed mercury-laden effluent to flow, untreated, into a nearby creek from 1961 to 1970. From 1970 to 1974, the insured's use of a waste treatment system abated but did not completely halt the flow of mercury into the creek. *Id.* at **3–4. Based on these facts, the Appellate Division applied the objective approach and granted summary judgment to the defendant insurance companies, finding that the insured's behavior of "[t]hrowing toxic waste out into the meadowlands," *id.* at *16, to be so inherently injurious as to be indistinguishable from the child abuse paradigm. *Id.*

Unlike in *Morton International,* the proof in the present case tends only to establish that Chemical Leaman knew that, despite its treatment system, the toxins in the rinsewater were causing damage to the groundwater.[7] This evidence goes to the central factual issue of whether the expected/intended clause precludes coverage. But it does not rise to so reprehensible a level as to trigger the *Voorhees* exception. The court, therefore, holds that the *Voorhees* particularly-reprehensible-act exception is inapplicable to the present case. *Hatco Corp. v. W.R. Grace & Co.,* 801 F.Supp. 1334, 1375–76 (D.N.J. 1992). Plaintiff's burden of proof is to show that Chemical Leaman neither subjectively intended to cause nor was substantially certain it was causing soil and groundwater damage. *Ambassador Ins. Co. v. Montes,* 147 N.J.Super. 286, 292, 371 A.2d 292 (App. Div.1977), *aff'd on other grounds,* 76 N.J. 477, 388 A.2d 603 (1978).

**B.** *Aetna's Motion for Summary Judgment on Its Pre–1961 "Accident"–Based Policies*

Aetna asks for summary judgment in its favor on the issue of coverage under its pre–1961 policies. These policies provided coverage for damage resulting from an "accident" rather than from an "occurrence," as in Aetna's post–1961 policies. Aetna makes two arguments. It first contends that these accident-based policies covered only an event, not a process. Since, according to Aetna, there can be no dispute that the groundwater and soil contamination at issue were caused by a long-term process rather than a single, bounded event, summary judgment is appropriate.

The pre–1961 policies did not define the word "accident." Accordingly, the court's task is to construe this term. The only New Jersey Appellate Division opinion that has apparently touched upon this issue in the context of environmental pollution is *Dia-*

*mond Shamrock Chem. v. Aetna Casualty & Sur. Co.,* 258 N.J.Super. 167, 609 A.2d 440 (App.Div.1992). In that case, the trial judge excluded soil and water contamination from coverage under an accident-based policy, ruling that the term "accident" means "a discrete fortuitous event which happens within a short time at a specific time and place." *Id.* at 199, 609 A.2d 440. The Appellate Division, deciding the case on other grounds, did not review the propriety of this ruling. *Id.* The court did, however, point to conflicting lines of authority in New Jersey case law on whether the term accident contains a temporal aspect. *Id.* at 199–200, 609 A.2d 440.

■ New Jersey law provides that the terms of an insurance contract should be understood according to their popular and common meaning. *See Kindervater v. Motorists Casualty Ins. Co.,* 120 N.J.L. 373, 376, 199 A. 606 (1938). However, "[w]hen the meaning of a phrase is ambiguous, the ambiguity is resolved in favor of the insured ... and in line with an insured's objectively-reasonable expectations." *Voorhees v. Preferred Mut. Ins. Co.,* 128 N.J. 165, 175, 607 A.2d 1255 (1992) (citation omitted); *cf. infra* Part IV.C. The court finds that the term accident is ambiguous when viewed in the context of liability for long-term environmental contamination. The 1957 *Black's Law Dictionary* defined the term accident as follows:

> In its most commonly accepted meaning, or in its ordinary or popular sense, the word may be defined as meaning a fortuitous circumstance, event, or happening, an event happening without any human agency, or if happening wholly or partly through human agency, an event which under the circumstances is unusual and unexpected by the person to whom it happens. . . .

Black's Law Dictionary 30 (4th ed. 1957), *quoted in Moffat v. Metropolitan Casualty Ins. Co. of New York,* 238 F.Supp. 165, 170

---

7. The court notes that there is evidence in the record that material from the Bridgeport facility discharged directly into a nearby swamp. *See* LMI's 12 Statement ¶¶ 57, 77, 87. Further evidence suggests that drums containing solid waste leaked directly onto the ground. *See id.* ¶ 91. The court finds that this evidence does not suffice to show that it was Chemical Leaman's *intention* for contaminated material to end up in the nearby swamp. However, this evidence, if believed by a jury to establish that Chemical Leaman knew or expected that its waste water would flow into the swamp, may support a finding of no coverage.

(M.D.Pa.1964). Absent from this definition is any limitation of an accident to a short-term event. Relying on this definition, courts have applied accident-based policies to polluting processes that occur over a long period of time. *See Moffat,* 238 F.Supp. 165 (liability resulting from long-term burning of coal mining wastes covered under accident-based policy). Because the common understanding of the term "accident" does not necessarily exclude long-term happenings, this court views the term as ambiguous and gives it a meaning that will result in coverage in the present case. Accordingly, the court construes the word "accident" in the pre-1961 policies to cover the long-term soil and groundwater contamination process at issue in the present case.

Having ruled that an accident-based policy can cover environmental damage to soil and groundwater over the course of many years, the court must now determine the appropriate intent standard. The New Jersey courts have spoken more clearly on this matter, defining the word "accident," as an

> " 'unexpected happening without intention or design.' . . . . Under this test, a volitional act by the insured nevertheless qualified as an "accident" if the insured did not specifically intend to cause the resulting harm or [was] not substantially certain that such harm w[ould] occur."

*Broadwell Realty Serv. Inc. v. Fidelity & Casualty Co.,* 218 N.J.Super. 516, 532, 528 A.2d 76 (App.Div.1987) (citations omitted); *see also Morton Int'l, Inc. v. General Accident Ins. Co. of Am.,* No. A–895–89T3, 1991 WL 348049 **19–21 (N.J.Super.App.Div. Oct. 2, 1991). *Diamond Shamrock,* 258 N.J.Super. at 200, 609 A.2d 440; *SL Indus. v. Am. Motorists Ins. Co.,* 248 N.J.Super. 458, 465, 591 A.2d 677 (App.Div.1991), *aff'd as modified and remanded,* 128 N.J. 188, 607 A.2d 1266 (1992). In other words, New Jersey law defines the term "accident" in the accident-based policies in substantially the same manner as the definition of an "occurrence" in the occurrence-based policies—an event neither expected nor intended by the insured.

In light of the above analysis, plaintiff at trial will bear the same standard of proof on the pre–1961 accident-based policies as it will on the occurrence-based policies. However, unlike with the post–1961 policies, Aetna challenges whether any soil or groundwater damage occurred to trigger the pre–1961 policies. The parties stipulated that Chemical Leaman provided tank truck cleaning services "since sometime in 1960." Joint Final Pretrial Order ¶ IV.30. Indeed, by March 1961, the record is clear that Chemical Leaman was using "basins" to collect wastewaters after it cleaned the tank trucks. *See* Letter from William T. Frank, Aetna's Ex. 8. Plaintiff's expert hydrogeologist states that

> Contaminated rinsewater from the three settling ponds started migrating through the soil to underlying ground water almost immediately after the beginning of pond operation in 1960. Contaminated rinsewater from the three settling ponds started migrating through the soil to underlying ground water almost immediately following the beginning of lagoon operation in 1962.

McLane Report at 12, Pl.'s App.Ex. 18. Aetna does not challenge this conclusion. In light of this undisputed fact, the court finds that groundwater and soil damage occurred sometime in 1960. Accordingly, the court holds that property damage triggered Aetna's April 1, 1960 through April 1, 1961, policy. Chemical Leaman, however, has presented no evidence of damage that could have triggered the April 1, 1959 through April 1, 1960, policy. Accordingly, the court grants summary judgment in Aetna's favor on this policy. Chemical Leaman may not recover under Aetna's 1959–1960 policies.

C. *The Parties' Cross–Motions for Summary Judgment on the Expected/Intended Issue*

The parties have submitted cross-motions for summary judgment on all policies on the issue of whether Chemical Leaman expected or intended to cause soil and groundwater damage. As ruled above, Chemical Leaman bears the burden of proof of showing that it neither expected nor intended to cause the disputed damages for each of defendants' policies. In resolving this fact issue, the jury must evaluate Chemical Leaman's subjective intent to cause the particular damage for

which plaintiff now seeks indemnification— namely soil and groundwater damage.

### 1. Chemical Leaman's Evidence

Plaintiff presents evidence that Chemical Leaman's rinsewater treatment system was designed to prevent harm to the environment by facilitating the elimination of toxic chemicals through natural processes. The rinsewater from Chemical Leaman's tank cleaning operations flowed into a series of unlined ponds and lagoons. Chemical Leaman designed this system to enhance the cleansing and removal of chemical constituents from the rinsewater through natural processes, such as phased gravity separation, sedimentation, floatation, microbial biodegradation, aeration, percolation, and evaporation. For example, the design concept limited the depth of the ponds to five feet in order to allow sunlight penetration and enhanced bacteriological degradation. In addition, the system contemplated that rinsewater would percolate down through the soil, and that adsorption, absorption, and attenuation by the soil, as well as microbial biodegradation, would remove chemical contaminants. The system further relied on gravity to separate materials by allowing the heavier materials to settle to the bottom of the pond or lagoon and the lighter materials to float to the top. Chemical Leaman then periodically removed settled particles or floating materials through dredging and skimming. Each pond or lagoon was connected to the next by a "tee" pipe, which, according to plaintiff, permitted only the cleanest rinsewater to pass to the next pond or lagoon. The fourth and fifth lagoons contained aeration devices to increase the oxygen level in the lagoon, thereby enhancing microbial biodegradation. An overflow pipe in the last lagoon operated as a safety valve to prevent a rupture in the lagoon dike.

Plaintiff has submitted evidence that the individuals who designed and oversaw the rinsewater treatment system did not expect or intend to cause soil or groundwater damage. *E.g.* Elston Aff. ¶¶ 3, 4 (attached as Ex.

3 to Pl.'s App. of Exs.).[8] The record also contains testimony from individuals familiar with the Bridgeport site, as well as from the insurers' expert, that the rinsewater treatment system could and did perform some or all of the purifying functions for which it was designed. Ford Dep. at 203–05; Lakhani Dep. at 77–78; Swanson Dep., Vol. II, at 48– 50, 56–58. Moreover, the use of unlined lagoons and ponds may have been standard practice in the truck cleaning business as well as in some other industries utilizing wastewater disposal methods. *E.g.* Middleton Dep. at 105–06; Ford Dep. at 315; Robinson Dep. at 72–73.

### 2. Defendants' Evidence

Defendants' evidence comprises three main categories. First, defendants introduce "state-of-the-art" scientific evidence to show that Chemical Leaman must have known that the Bridgeport rinsewater treatment system would contaminate the soil and groundwater. Second, defendants proffer evidence of investigations into environmental pollution occurring at the Bridgeport site. Third, defendants present evidence of Chemical Leaman's knowledge of soil and groundwater contamination at Chemical Leaman truck cleaning sites other than the Bridgeport facility.

*State-of-the-Art Scientific Evidence*

■ According to defendants, it was well known at the time the Bridgeport facility opened that unlined lagoons had a propensity to pollute soil and groundwater. For example, one scientific text, published in 1955, states:

> Absorption lagoons are specifically designed to permit seepage of liquid into the ground. This seepage ultimately reaches a stream or an underground water stratum; hence absorption lagoons should not be employed for toxic wastes.

Gurnham, Principles of Industrial Waste Treatment 319 (1955). Similarly, defendants present evidence of rinsewater treatment

---

8. LMI challenges the Elston Affidavit as untimely for use in support of Chemical Leaman's motion for summary judgment. LMI's Reply Br. at 8–9. The court does not address LMI's challenge be-

cause it does not grant Chemical Leaman summary judgment on the expected and intended issue.

techniques used to clean railroad tank cars. Thus, the General American Transportation Corporation apparently employed a "large, impermeable solar evaporation basin ... coated with an asphaltic concrete mix" to treat rinsewater. LMI Reply Br. at 12. Defendants assert that the designers of Chemical Leaman's Bridgeport system, as professional sanitary engineers who kept up with current development, necessarily must have been aware of this scientific information, and therefore must have known that the contaminants would pollute the soil and groundwater.[9]

*Bridgeport Site Evidence*

Defendants submit evidence that Chemical Leaman was aware that its Bridgeport system was causing environmental problems. The record contains reports of individuals and monitoring entities that, at various times, expressed concern that waste material was flowing directly into a nearby swamp and creek. LMI's 12G Statement ¶¶ 9; 28, 57, 77, 81, 87. A 1966 petition signed by residents living near the Bridgeport facility complained "that matters and things emanating from the property of Chemical Leaman Tank Line, Inc., have permeated food stuff and growing things." Aetna's Ex. 21. In a 1970 report, the New Jersey DEP stated that Chemical Leaman "is still discharging objectionable materials into the waters of the State." Aetna's Ex. 27. Also in 1970, a senior public health engineer in New Jersey found that the high phenols concentration in the wastewater "may produce toxic conditions in the swamp and stream." Aetna's Ex. 34. The record further contains evidence showing that Chemical Leaman was regularly informed that its facility was causing air pollution. *See* Aetna's Exs. 8, 44, 69.

*Other Chemical Leaman Sites*

Finally, defendants present evidence that Chemical Leaman's problems at other tank cleaning sites gave the company actual knowledge that the use of unlined ponds and lagoons would contaminate the soil and the groundwater. For example, in 1960, West Virginia environmental authorities informed Chemical Leaman that the use of storage ponds in Putnam county had resulted in groundwater pollution. LMI's 12G Statement ¶ 5. Then in 1969, West Virginia ordered Chemical Leaman to stop the use of these lagoons because contaminated waters were leaching and seeping into the groundwater. LMI 12G Statement ¶ 26. In 1966, a consultant commissioned to investigate a Chemical Leaman site in Pennsylvania stated that "[w]ithout a groundwater and substrata study, we cannot be sure that some wastewater infiltration does not occur." LMI's 12G Statement ¶ 22. Another consultant warned that "no microbial degradation" was occurring in the lagoons at Chemical Leaman's West Caln Township site. The consultant recommended that Chemical Leaman "take steps to insure that so long as dumping is continued into these pits no highly toxic materials will be added to them." LMI's 12G Statement ¶ 20.

### 3. Conclusions

■ The court first finds that defendants have presented abundant evidence tending to establish Chemical Leaman's knowledge of the deleterious effect of its Bridgeport rinsewater treatment system on the soil and groundwater. A reasonable juror may fairly conclude from this material that plaintiff has failed to prove by a preponderance of the evidence that Chemical Leaman neither expected nor intended its system of ponds and lagoons to cause this damage. Accordingly, Chemical Leaman's motion for summary judgment on the expected/intended requirement is denied.

The more difficult question is whether the present record requires the court to find that there can be no genuine dispute that Chemical Leaman did intend to pollute the soil and groundwater. The court looks to two recent cases for assistance. In *Diamond Shamrock*

---

9. According to defendants, the principal engineer in charge of designing the rinsewater treatment system was Edwin Wagner. Because Mr. Wagner is dead, it is difficult to establish the breadth of his knowledge at the time the Bridgeport facility was built. There is, however, testimony from other individuals on Mr. Wagner's actions and knowledge. *See* Elston Dep.; Holman Dep. And it is permissible for a jury, if it so chooses, to infer from Mr. Wagner's professional standing as a sanitary engineer that he had actual knowledge of state-of-the-art scientific knowledge.

*Chemical v. Aetna Casualty & Surety Co.*, 258 N.J.Super. 167, 609 A.2d 440 (App.Div. 1992), the Appellate Division upheld the Chancery Division's finding, after a full bench trial on the merits, that the insured, Diamond, expected and intended to pollute the environment at its Agent Orange manufacturing facility in Newark, New Jersey. The evidence at trial established that Diamond's management knew of the hazardous nature of the chemicals it was producing. *Id.* at 182–83, 609 A.2d 440. Despite this knowledge, Diamond failed to take steps to prevent the emission of these chemicals into the environment. The company regularly vented contaminants directly into the atmosphere. *Id.* at 214, 609 A.2d 440. The plant commonly experienced leaks and spills in the manufacturing area, and when employees cleaned the floor, some of the run-off flowed directly into a nearby river. *Id.* Pipes carrying contaminants leaked. *Id.* at 184–85, 609 A.2d 440. When the company washed down railroad cars that hauled Agent Orange, the effluent seeped onto the tracks and into the ground. *Id.* at 185, 609 A.2d 440. After reviewing this evidence, the Appellate Division affirmed the lower court's determination "that Diamond knew 'the nature of the chemicals it was handling,' knew that 'they were being continuously discharged into the environment,' and knew that 'they were doing at least some harm.'" *Id.* at 211, 609 A.2d 440.

The court in *Hatco Corp. v. W.R. Grace & Co.*, 801 F.Supp. 1334 (D.N.J.1992), addressed summary judgment motions on the expected or intended requirement in a case similar to the one at bar. There, the insured brought suit against its primary and excess insurance carriers for coverage on its cleanup liability pursuant to CERCLA. The insured operated an industrial chemical manufacturing facility in Ford, New Jersey, between 1959 and 1978. Early in the plant's history, effluent containing hazardous byproduct chemicals was pumped directly into streams and ditches that led directly into the Passaic River. In the early to mid 1960s, the insured built unlined ponds to hold the effluent so that chemical products could be recovered, reprocessed, and then sold. Later, the insured installed clay-lined lagoons and a sew-er line that connected to a regional authority's industrial sewer system. *Id.* at 1343.

The court in *Hatco* found that the carriers had presented evidence establishing that the insured knew in the 1960s that its waste disposal practices caused extensive surface water and air pollution. *Id.* at 1376. The carriers also submitted evidence tending to show the insured's knowledge in the mid 1960s of the possibility that effluent pumped into unlined holding ponds could seep into the ground. *Id.* at 1376. The court, however, refused to presume, as a matter of law, that this evidence amounted to undisputed proof that the insured expected or intended to cause soil and groundwater damage. Accordingly, the carriers' motions for summary judgment were denied. *Id.*

The court reads *Diamond Shamrock* and *Hatco* to establish the following standards for granting summary judgment in defendants' favor in the present case. The record must reflect no genuine disputes as to three factual propositions. First, Chemical Leaman must have known of the environmental hazards of the contaminants it was putting into its ponds and lagoons. Second, Chemical Leaman must have known that the contaminants in the ponds and lagoons were seeping into the soil and groundwater. Third, Chemical Leaman must have known that the contaminants that were seeping into the soil and groundwater were causing permanent damage to the soil and groundwater. If these factual predicates are established on the present record, then the court may rule as a matter of law that Chemical Leaman expected or intended to cause soil and groundwater contamination.

*Knowledge of the Environmental Hazards of the Contaminants*

The entire thrust of plaintiff's evidence on the expected/intended issue is that Chemical Leaman designed its unlined ponds and lagoons treatment system to remove contaminants from the rinsewater. In light of this argument, plaintiff cannot reasonably contest the fact that it was aware of the environmental hazards of the contaminants it placed into the rinsewater treatment system. The court,

therefore, deems this fact as established. *See* Fed.R.Civ.P. 56(d).

*Knowledge That the Contaminants Were Seeping Into the Soil and Groundwater*

Analysis of this factual issue must distinguish between soil and groundwater. There can be no dispute that Chemical Leaman knew that the contaminants were seeping into the soil. Chemical Leaman left the ponds and lagoons unlined precisely because one of the goals of the rinsewater treatment system was to utilize the soil in the cleansing process. Accordingly, the court deems this to be an established fact. *See* Fed.R.Civ.P. 56(d).

In contrast, the court finds that the state of Chemical Leaman's knowledge with respect to the seepage of contaminants into the groundwater remains in dispute. Evidence in the record indicates that Chemical Leaman was at various times informed that contaminants from the rinsewater treatment system could reach or were reaching the groundwater. However, Chemical Leaman is entitled to challenge the relevance, materiality, credibility, and weight that should be given to this material. For example, plaintiff argues, and a jury may reasonably find, that Chemical Leaman understood groundwater contamination at facilities other than the Bridgeport terminal to be site specific. *Cf. New Castle County v. Hartford Accident and Indem. Co.,* 933 F.2d 1162, 1191–92 (3d Cir. 1991). Accordingly, Chemical Leaman's knowledge of the seepage of contaminants into the groundwater remains a genuine issue of fact that must be resolved at trial.

*Knowledge That the Contaminants Were Causing Permanent Damage*

The court finds that a genuine dispute exists on whether Chemical Leaman intended that the rinsewater treatment system at its Bridgeport facility result in the contamination of the soil. It is true that Chemical Leaman's rinsewater treatment system resulted in known contaminants settling in the soil at the bottom of the ponds and lagoons. It is also true that this fact, when combined with the fact established above that Chemical Leaman knew of the deleterious effect on the environment of the contaminants in the rinsewater, would normally lead to the conclusion that Chemical Leaman knew that permanent damage to the soil would result. However, there is evidence that Chemical Leaman may have believed it rid the soil of these contaminants when it periodically dredged the bottom of the ponds and lagoons. Moreover, there is testimony that the designers and operators of the unlined rinsewater treatment system believed that the processes of filtration, biodegradation, and adsorption would remove and breakdown the contaminants, much like a domestic septic system was thought to operate. *See* Elston Dep. at 137–38; Ford Dep. at 386–87. A jury may reasonably infer from this evidence that Chemical Leaman neither expected nor intended to contaminate the soil, even though it placed known pollutants into the soil.

The court also finds that Chemical Leaman's knowledge that the seeping contaminants would cause permanent damage to the groundwater is necessarily a disputed issue given that it remains an open factual issue for resolution at trial.

Based on the foregoing analyses, the court denies the defendants' motions for summary judgment on the expected/intended issue.

## III. Continuous Trigger Theory

The parties are in agreement that between 1960 and 1975, Chemical Leaman daily placed between 10,000 and 20,000 gallons of contaminated rinsewater into the unlined ponds and lagoons at the Bridgeport site. *See* Aetna's Br. at 16; Pl.'s Reply Br. at 59; LMI Br. at 4. It therefore appears undisputed that an event resulting in property damage occurred during these years to trigger the policies then in effect. Chemical Leaman, however, is also suing for coverage under defendants' policies in effect between 1975 and 1985, after the company stopped using the unlined ponds and lagoons treatment system. In order to obtain coverage under these policies, Chemical Leaman argues that New Jersey applies a "continuous trigger" theory to determine the time when property damage occurred within the meaning of defendants' insurance policies. According to Chemical Leaman, the continuous trigger theory provides that all of defen-

dants' policies are triggered from 1960 (when Chemical Leaman first began operating the Bridgeport rinsewater treatment system) through 1985 (when Chemical Leaman claims it became fully aware of both the nature and extent of the groundwater contamination and its legal obligation to pay damages resulting from that contamination). The continuous trigger theory would allow Chemical Leaman to recover the full amount under any policy falling within the trigger period. *See Keene Corp. v. Insurance Co. of N. Am.*, 667 F.2d 1034, 1041 (D.C.Cir.1981), *cert. denied*, 455 U.S. 1007, 102 S.Ct. 1644, 71 L.Ed.2d 875 (1982). Defendants contest the proposition that New Jersey courts would apply the continuous trigger doctrine to the present case.

■ This court finds that New Jersey law permits the application of the continuous trigger theory, subject to certain predicate factual findings. *Accord Hatco Corp. v. W.R. Grace & Co.*, 801 F.Supp. 1334, 1344–46 (D.N.J.1992). Indeed, the New Jersey Appellate Division has already adopted the continuous trigger approach. In *Gottlieb v. Newark Ins. Co.*, 238 N.J.Super. 531, 570 A.2d 443 (App.Div.1990), the court addressed the question of when liability would be triggered for the migration of pesticide from the area in a house where it was originally applied. The trial court granted summary judgment, ruling that the policy unambiguously defined "occurrence" to include only those damages that occurred upon initial exposure and discovery of contamination in the house in 1982. *Id.* at 532–33, 570 A.2d 443. The Appellate Division reversed and held that the carrier's 1983, 1984, and 1985 policies also provided coverage for the subsequent migration of the pesticide. Finding that the term "occurrence" was ambiguous when applied to the phenomenon of continuing damage, the court in *Gottlieb* adopted a continuous trigger analysis in order to interpret and define the term. *Id.* at 535–36, 570 A.2d 443. "[W]here an injury process is not a definite discrete event, the date of occurrence should be the continuous period from exposure to manifestation of damage." *Id.* at 535, 570 A.2d 443.

Under the continuous trigger theory, all insurance policies activated by an ongoing occurrence "are jointly and severally liable to policy limits for all damages resulting from that occurrence, including damage that occurred before and after the policy period." *Hatco Corp.*, 801 F.Supp. at 1346. The court in *Hatco* articulated the reasoning for adopting joint and several liability. "First, the language of the policies themselves do not limit coverage to injury that occurs during the policy period. Thus, as a matter of contract interpretation, overlapping coverage, in effect, had been bargained for." *Id.* (citation omitted). Second, the court analyzed language similar to that found in Aetna's and LMI's policies and determined that "because the Insurers agreed to 'pay all sums which the insured shall become legally obligated to pay as damages', they in effect step into the shoes of the insured." *Id.* In the present case, Chemical Leaman's "shoes" entail strict liability under CERCLA for the full cost of the cleanup of soil and groundwater damages caused by the Bridgeport facility, regardless of when it disposed of the hazardous substances. This court finds the analysis in *Hatco* persuasive and holds that all policies triggered by a continuous occurrence will be jointly and severally liable. *See also Lac D'Amiante Du Quebec v. Am. Home Assurance*, 613 F.Supp. 1549, 1561–63 (D.N.J. 1985).

■ New Jersey law requires the insured to make two factual showings before imposing joint and several liability under the continuous trigger theory.[10] First, the insured must establish that some kind of property damage occurred during each policy period for which the insured seeks coverage. *Gottlieb*, 238 N.J.Super. at 536, 570 A.2d 443; *Hatco Corp.*, 801 F.Supp. at 1354. Thus, in the present case, Chemical Leaman must prove that soil and groundwater damage took place during the period of each policy for which it seeks coverage. Second, the insured must establish that the property damage was part of a continuous and indivisible process of

---

10. The insured must establish that a policy is triggered in order to obtain coverage, and therefore must bear the burden of proof. *Diamond Shamrock Chemicals v. Aetna Casualty & Sur. Co.*, 258 N.J.Super. 167, 218, 609 A.2d 440 (App. Div.1992).

injury. *Hartford Accident & Indem. Co. v. Aetna Life & Casualty Ins. Co.*, 98 N.J. 18, 29, 483 A.2d 402 (1984); *Hatco Corp.*, 801 F.Supp. at 1345. Here Chemical Leaman needs to show that the injuries caused by its use of the Bridgeport rinsewater treatment system were of a continuous, indivisible nature. The court finds that, despite evidence submitted by Chemical Leaman, *see* Pl.'s Reply Br. at 56, 59, neither of these issues is undisputed on the basis of the present record. Plaintiff's motion for summary judgment on the continuous trigger theory must be denied.

■ In sum, if Chemical Leaman establishes these factual predicates it may recover from defendants the full amount of coverage *permitted under each insurance policy* in effect from 1960 until *the manifestation of the soil and groundwater damage.* The court underscores the two phrases in the previous sentence in order to emphasize additional issues that are potentially in dispute. First, defendants may defeat plaintiff's recovery under a policy activated by a continuous trigger if defendants establish that an applicable policy exclusion bars coverage. *Hatco Corp.*, 801 F.Supp. at 1344.[11] If an exclusion applies, coverage is precluded notwithstanding the continuous trigger. A second issue concerns the timing of the manifestation of the soil and groundwater damage. Chemical Leaman maintains that it only became aware in 1985 of the full scope of the property damage caused by the soil and groundwater contamination and its ensuing liabilities for cleanup costs. Defendants argue for an earlier date. The undeveloped state of the record requires the court to find that this issue remains a disputed fact question. It is for the jury to decide the date of manifestation.

## IV. Pollution Exclusion Clause

### A. *The Broadwell Line of Cases*

Defendants' policies in effect after April 1, 1971 contain pollution exclusion clauses. The parties dispute whether the events causing the soil and groundwater damage fall within the "sudden and accidental" exception to the pollution exclusion provision.[12] This heavily litigated issue turns in the first instance on the meaning of the word "sudden." Defendants argue that Chemical Leaman's placing of pollutants in the ponds and lagoons was not sudden because, temporally, it took place over many years rather than all at once. Plaintiff rejects this proposed definition and asks the court to rely on a line of New Jersey appellate precedent which, beginning with the case of *Broadwell Realty Serv., Inc. v. Fidelity & Casualty Co.*, has defined the word "sudden" without a temporal element, construing the "sudden and accidental" exception to apply to "an 'unexpected,' 'unforeseen' or 'fortuitous' event." 218 N.J.Super. 516, 536–37, 528 A.2d 76 (1987); *see also Summit Assoc., Inc. v. Liberty Mut. Fire Ins. Co.*, 229 N.J.Super. 56, 62, 550 A.2d 1235 (App.Div.1988). Thus, under Chemical Leaman's proposed reading, the "sudden and accidental" exception does not contain a temporal element, and it is therefore irrelevant that the discharge and spread of toxic material took place over the course of more than two decades.

The court's task is to interpret the meaning of the pollution exclusion clause under New Jersey law. Although there exists a line of Appellate Division cases, the state

---

11. The court notes that the "Other Insurance" clauses found in certain of defendants' policies only affect the rights of the insurers among themselves. They do not implicate Chemical Leaman's right to full recovery under each triggered policy. *Starks v. Hosp. Serv. Plan of N.J., Inc.*, 182 N.J.Super. 342, 351, 440 A.2d 1353 (App. Div.1981), *aff'd*, 91 N.J. 433, 453 A.2d 159 (1982); *Cozzi v. Government Employees Ins. Co.*, 154 N.J.Super. 519, 529, 381 A.2d 1235 (App. Div.1977); *see also Lac D'Amiante Du Quebec*, 613 F.Supp. at 1563.

12. LMI's pollution exclusion clause for its policies in effect from April 1, 1971, to April 1, 1974, and for April 1, 1977, to April 1, 1985, contain an exception for a "sudden, unintended, and unexpected happening." The court's analysis on whether the term "sudden" contains a temporal element is controlling for these policies. And, because the court finds that "accidental" means unintended and unexpected, there is no reason to construe "sudden, unintended, and unexpected" any differently than "sudden and accidental." Indeed, neither LMI nor Chemical Leaman makes any argument to the contrary.

Supreme Court has not yet directly ruled on the issue.[13] "Where an intermediate appellate state court rests its considered judgment upon the rule of law which it announces, that is a datum for ascertaining state law which is not to be disregarded by a federal court unless it is convinced by other persuasive data that the highest court of the state would decide otherwise." *West v. A.T. & T.*, 311 U.S. 223, 237, 61 S.Ct. 179, 183, 85 L.Ed. 139 (1940). Thus, "[t]he decisions of lower appellate courts may be persuasive, should be accorded proper regard and are presumptive evidence of state law." *Commercial Union Ins. v. Bituminous Casualty Corp.*, 851 F.2d 98, 100 (3d Cir.1988).

Defendants propose two alternative arguments as to why this court should rule that *Broadwell* and its progeny are wrongly decided. First, they contend that the term "sudden" is clear and unambiguous in its meaning, and includes a temporal element. Second, defendants maintain that, even assuming that the term "sudden" is ambiguous, extrinsic evidence proves that the drafters of the pollution exclusion clause intended for the term to include a temporal dimension. The court addresses each of these arguments in turn.

B. *The Ambiguous Meaning of the "Sudden and Accidental" Exception*

▮ In *Broadwell*, the Appellate Division, after noting the "extraordinary number of lawsuits" generated by the pollution exclusion, found that the "sudden and accidental" clause was ambiguous because the meaning of the term "sudden" may or may not included a temporal element. 218 N.J.Super. 516, 536, 528 A.2d 76 (App.Div.1987). Recent caselaw has affirmed this result. *CPC Int'l v. Northbrook Excess & Surplus Ins.*, 962 F.2d 77 (1st Cir.1992) (applying New Jersey law); *Hatco Corp. v. W.R. Grace & Co.*, 801 F.Supp. 1334, 1349–50 (D.N.J.1992); *see also New Castle County v. Hartford Acc. and Indem. Co.*, 933 F.2d 1162, 1198–99 (3d Cir.1991) (finding "sudden and accidental" phrase ambiguous under Delaware law).

**13.** The court notes that the New Jersey Supreme Court has granted certification on the pollution exclusion clause issue in *Morton Int'l, Inc. v.*

The court follows the reasoning and analyses in these cases, and predicts that the New Jersey Supreme Court will do the same.

C. *Contra Proferentum vs. "Sophisticated Insured"*

Defendants' second argument acknowledges that the word "sudden" is ambiguous under New Jersey case law, but relies on extrinsic evidence to prove that the term contains a temporal aspect. The principle implicitly at work in this argument is the standard contract rule that extrinsic evidence is admissible to explain an ambiguous contract.

▮ The court must reject defendants' invitation to evaluate the proffered evidence of drafters' intent. Even assuming that the evidence of the drafter's intent conclusively shows the desired meaning of the word "sudden," the doctrine of *contra proferentum*—or "against the one who proffers"—precludes this court from considering this evidence. In insurance law, the doctrine of *contra proferentum* provides that where a term in an insurance policy is ambiguous, giving rise to two equally plausible interpretations, the term will be given the meaning that results in coverage. *Mazzilli v. Accident & Casualty Ins. Co. of Winterthur*, 35 N.J. 1, 7–8, 170 A.2d 800 (1961). The reason for this rule of interpretation is that New Jersey law considers standard form insurance policies to be contracts of adhesion. *Sparks v. St. Paul Ins. Co.*, 100 N.J. 325, 335, 495 A.2d 406 (1985). The insurance carriers generally draft the language of these policies on their own, without input from or negotiation with the insured. *See New Castle County v. Hartford Accident and Indem. Co.*, 933 F.2d 1162, 1181, 1182 n. 43 (3d Cir.1991). These circumstances require that "[w]hen the meaning of a phrase is ambiguous, the ambiguity is resolved in favor of the insured ... and in line with an insured's objectively-reasonable expectations." *Voorhees, v. Preferred Mut. Ins. Co.*, 128 N.J. 165, 175, 607 A.2d 1255 (1992) (citation omitted).

*General Acc. Ins. Co. of Am.*, 127 N.J. 563, 606 A.2d 374 (1992).

Defendants argue that the strict rule of *contra proferentum* should not be followed in the present case, because Chemical Leaman is a "sophisticated" buyer and user of insurance. This court, however, is convinced that the size or sophistication of the insured is irrelevant under New Jersey law to the application of the rule of *contra proferentum* when the policy in dispute has been drafted solely by the carrier.[14] *Hatco Corp. v. W.R. Grace & Co.*, 801 F.Supp. 1334, 1349 (D.N.J.1992); *CPS Chem. Co. v. Continental Ins. Co.*, 222 N.J.Super. 175, 189–90, 536 A.2d 311 (App.Div.1988); *see also Diamond Shamrock Chem. v. Aetna Casualty & Sur. Co.*, 258 N.J.Super. 167, 209, 609 A.2d 440 (App.Div.1992) (suggesting, in dicta, that "only where it is clear that an insurance policy was 'actually negotiated or jointly drafted,' and where the policy holder had bargaining power and sophistication, is the rule of strict construction of policy terms against the insurer not invoked."). In the present case, Chemical Leaman played no role in negotiating or drafting the terms of the insurance policies.[15] The court, therefore, applies the rule of *contra proferentum* and holds that the term "sudden" in the pollution exclusion clause does not include a temporal aspect in its meaning. A long-term environmental pollution occurrence, such as the one involved here, falls within the exception to the pollution exclusion clause, so long as it was neither expected nor intended by the insured.

---

14. Aetna also argues that the doctrine of "the reasonable expectations of the insured" requires the court to consider evidence of Chemical Leaman's knowledge and insurance matters. *See* Aetna's Br. at 28–39. The court rejects this line of argument. The reasonable expectation of the insured doctrine is best understood as a justification for applying the rule of *contra proferentum* when a policy term is ambiguous. If a term is susceptible to two meanings, one precluding and one supporting coverage, then it is proper to assume that the insured will reasonably understand the terms to provide coverage. In this way, *contra proferentum* fulfills the insured's reasonable expectations.

15. Aetna has stipulated to this fact. *See* Joint Final Pretrial Order ¶¶ IV.5, 6. LMI, while refusing to stipulate to this fact, offers no evidence to dispute its truth.

## D. The Parties' Cross–Motions for Summary Judgment

Based on the above reading of the law, Chemical Leaman asks for a ruling that the pollution exclusion does not apply to the present case. The basis of Chemical Leaman's argument is that the pollution exclusion clause, because of the sudden and accidental exception, does no more than restate the scope of coverage under the basic occurrence-based terms of the policy.[16] In other words, the pollution exclusion clause, according to plaintiff, precludes coverage only if Chemical Leaman expected or intended to cause soil and groundwater damage. Pl.'s Br. at 35.

The problem with plaintiff's proposed reading is that the language of the pollution exclusion focuses not on damage but on "the discharge, dispersal, release or escape" of contaminants or pollutants. It is true that the court in *Broadwell* observed that the pollution exclusion clause was "simply a restatement of the definition of 'occurrence'—that is, that the policy will cover claims where the injury was 'neither expected nor intended.'" 218 N.J.Super. 516, 534, 528 A.2d 76 (App.Div.1987). Subsequent case law, however, has correctly characterized this observation as dicta and thus nonbinding. *See Hatco Corp.*, 801 F.Supp. at 1352. This court finds the language of the pollution exclusion clauses in defendants' policies to be clear and unambiguous in this regard.[17] The pollution exclusion precludes

---

16. The court does not address plaintiff's argument that the insurers' official representations to state insurance commissions estop them from now advancing a more restrictive interpretation of the pollution exclusion clause. *See* Pl.'s Reply Br. at 38–41. This separate ground for summary judgment was first raised only in plaintiff's reply brief and will therefore not be considered. The court will construe the pollution exclusion clause according to New Jersey law.

17. The pollution exclusion clauses in LMI's policies in effect from April 1, 1971 to April 1, 1974, and from April 1, 1977 to April 1, 1985 applied to "seepage, pollution or contamination" rather than "discharge, dispersal, release or escape." The court finds that the former language does not lead to any different result on the issues currently before it. Nor do the parties make any such argument.

coverage when the insured has caused the discharge of contaminants or pollutants, unless the discharge was neither expected nor intended from the standpoint. of the insured.[18] *See Liberty Mut. Ins. Co. v. Triangle Indus., Inc.*, 957 F.2d 1153, 1156–58 (4th Cir.1992) (applying New Jersey law), *cert. denied*, —— U.S. ——, 113 S.Ct. 78, 121 L.Ed.2d 42 (1992); *Hatco Corp. v. W.R. Grace & Co.*, 801 F.Supp. 1334, 1351 (D.N.J. 1992). The insurer bears the burden of proving this exclusion. *New Castle County v. Hartford Accident & Indem. Co.*, 933 F.2d 1162, 1181–82 (3d Cir.1991) (applying Delaware law). In light of the above legal analysis, plaintiff is wrong in arguing that the sudden and accidental exception to the pollution exclusion clause is coextensive with the policy's basic coverage under the occurrence clause. Rather, "the pollution exclusion clause shifted the critical focus from damage to discharge, but did not, at the same time, introduce a temporal element into that inquiry through the use of the word 'sudden' " *Id.* at 1201. Accordingly, the court must deny plaintiff's motion for summary judgment.

■ The court, however, does grant partial summary judgment to defendants as to *soil damage* on all policies containing a pollution exclusion. As discussed previously, the record is replete with evidence that Chemical Leaman intended to discharge contaminants into the soil at the Bridgeport site. *E.g.* Elston Dep. at 137; Middleton Dep. at 125. Indeed, plaintiff admits that Chemical Leaman contemplated such discharges as part of the design of its rinsewater treatment system with unlined ponds and lagoons. Pl.'s Reply Br. at 18–19. These discharges of contaminants into the soil do not fall within the "sudden and accidental" exception to the pollution exclusion, and Chemical Leaman is therefore barred from recovering from the

carriers under the relevant policies for any sums used to remediate soil damage. Whether Chemical Leaman intended to discharge contaminants into the groundwater remains a genuine issue of dispute. Summary judgment on this issue must, therefore, be denied.

## V. Owned–Property Exclusion

In its March 31, 1992 opinion, this court held "that the owned-property exclusion does not apply to remedial measures taken by Chemical Leaman that are designed to correct injury or to prevent further injury to the ground and surface waters in the vicinity of its Bridgeport facility." *Chemical Leaman Tank Lines, Inc. v. Aetna*, 788 F.Supp. 846, 853 (D.N.J.1992). LMI asks for reconsideration of this holding in light of the New Jersey Supreme Court's opinion in *State v. Signo Trading Int'l*, 130 N.J. 51, 612 A.2d 932 (1992). LMI's principal contention is that *Signo Trading* requires an apportionment for onsite versus offsite soil contamination. LMI Reply Br. at 24.[19] The court, after careful consideration of the *Signo Trading* opinion, finds that its prior holding stands as good law. It is implicit in the court's decision that the carriers will not be obligated to indemnify Chemical Leaman for cleanup costs that are intended to remediate damage at the Bridgeport site. The resolution of this issue must await trial.

## VI. Late Notice

■ Defendants' insurance policies required, as a condition precedent to coverage, that the insured provide "as soon as practicable" written notice in the event of an occurrence or accident. Both Aetna and LMI disclaim coverage on the basis of these provisions, asserting that Chemical Leaman failed to give timely notice.[20] Indeed, plaintiff con-

18. In *Hatco Corp.*, the court held that New Jersey law does not require the "insured to be aware of the harmful nature of the pollutants when they were discharged or released" in order for the pollution exclusion to apply. 801 F.Supp. at 1352. In light of the finding that it is undisputed that Chemical Leaman knew of the hazardous environmental effect of the contaminants in the rinsewater, the court does not reach this legal issue.

19. LMI concedes that no apportionment of costs for groundwater contamination cleanup is required. LMI's Reply Br. at 24.

20. Defendants also seek to avoid coverage on the basis of the equitable defenses of laches and estoppel. New Jersey law considers laches to be identical to the late notice defense. *Allstate Ins. Co. v. Howard Sav. Inst.*, 127 N.J.Super. 479, 489–90, 317 A.2d 770 (Ch.Div.1974). New Jersey law also requires a showing of prejudice for

cedes that Chemical Leaman is in breach of the notice clauses. Tr. of Oral Argument at 28–29. However, this admission does not end the inquiry. New Jersey law is clear that an insurer may deny coverage on the basis of a notice clause only after proving not only that the insured breached but also that the insurer suffered a likelihood of appreciable prejudice as a result. *Cooper v. Government Employees Ins. Co.*, 51 N.J. 86, 94, 237 A.2d 870 (1968).

Thus, the court addresses whether Chemical Leaman's late notice caused defendants to suffer a likelihood of appreciable prejudice. Timely notification pursuant to a notice clause allows an insurer to investigate the merits of both the insured's claim against the carrier and the underlying claim against the insured that allegedly triggers coverage. In light of these goals, the court in *Morales v. National Grange Mut. Ins. Co.*, 176 N.J.Super. 347, 423 A.2d 325 (Law Div.1980), focused on two factors in determining whether a likelihood of appreciable prejudice exists.[21] The first is "whether substantial rights have been irretrievably lost by virtue of the failure of the insured to notify the carrier in a timely fashion." *Id.* at 355, 423 A.2d 325. Some of the substantial rights implicated by late notice include "the availability of witnesses, the ability to discover information regarding the location of the accident, any physical changes in the scene during the delay, the existence of official reports concerning the occurrence, the preparation and preservation of demonstrative and illustrative evidence such as vehicles or photographs, and the ability of experts to reconstruct the scene." *Id.* In making its case, the insurer "must establish more than the mere fact that it cannot employ its normal procedures in investigating and evaluating the claim." *Id.* Rather, it must show that substantial rights have been *irretrievably* lost.

The second factor is "the likelihood of success of the insurer in defending against the" underlying claim. This inquiry implicates the notice clause's function of allowing the carrier to assume the defense of the underlying claim, if it so desires. As the court in *Morales* noted:

> In some cases the liability of the insured and the resulting damages are so clear that it would be unfair to preclude the plaintiff from recovering against the carrier. For that reason the carrier should be required to show the likelihood that it would have had a meritorious defense had it been informed of the accident in a timely fashion.

*Id.* at 355–56, 423 A.2d 325.

A. *Substantial Rights Irretrievably Lost*

Defendants present two principal arguments on the irretrievable loss of substantial rights. First, they contend that the death of witnesses and witnesses' loss of memory resulting from the passage of time have seriously prejudiced their ability to dispute their coverage obligations under the policies. Second, defendants maintain that the 1977 draining and filling of the ponds and lagoons at the Bridgeport site also deprived defendants of evidence that would have enhanced their ability to dispute coverage.

■ Plaintiff seeks indemnification for its cleanup liabilities and defense costs incurred pursuant to the EPA's CERCLA claim. It is, therefore, beyond dispute that notice should have been given to defendants, at the earliest, by 1984, when the EPA placed the Bridgeport site on the Superfund national priorities list. The court finds that the evidence in the record fails to establish that defendants suffered a likelihood of appreciable prejudice in their ability to contest coverage. Defendants have not shown that any material witnesses have died since 1984. Nor have they proven that the fading or

---

carrier to succeed on an estoppel defense. *See Merchants Indem. Corp. v. Eggleston*, 37 N.J. 114, 127–28, 179 A.2d 505 (1962). The court, therefore, reaches the exact same results on the parties' laches and estoppel defenses as it does below on the late notice defense.

**21.** The court follows the lead of two other district courts in applying *Morales'* analysis of the law of appreciable prejudice to an environmental insurance case. *See Hatco Corp. v. W.R. Grace & Co.*, 801 F.Supp. 1334, 1371–72 (D.N.J.1992); *Witco Corp. v. Travelers Indemnity Co.*, Civ. No. 86–2907, 1987 WL 65060 **14–16, 1987 U.S. Dist. LEXIS 14295 **38–40 (D.N.J. May 1, 1987).

failure of witnesses' memory has irretrievably harmed their ability to advance their case against Chemical Leaman. In addition, the material attached to the current summary judgment motions, culled from the files of Chemical Leaman, the insurers, government agencies, and various other entities, shows that a wealth of relevant documentary evidence remains intact. Finally, defendants could not have obtained evidence from the original ponds and lagoons at the Bridgeport site in 1984, with or without timely notice, because the site was drained and backfilled by 1977. In sum, defendants are currently able to mount a strong, well-documented case against coverage, the crux of which is that Chemical Leaman expected or intended from 1960 to 1975 to cause soil and groundwater contamination. The insurers have not submitted proof that they would have been in any better position to make this case beginning in 1984 upon timely notice rather than in 1988 or 1989.

### B. *Likelihood of Success in Defending the Underlying Claim*

██ The second *Morales* factor concerns the defendants' likelihood of success in the underlying claim against Chemical Leaman if they had taken over defense of the claim upon timely notice. Chemical Leaman, as owner and operator of the Bridgeport facility, is strictly liable under CERCLA for damages for injury to, destruction of, or loss of natural resources, as well as for the reasonable costs of assessing such damage to natural resources, and all costs of removal, remediation, or other necessary response costs. Chemical Leaman's liability for these damages is retroactive, joint, and several, and imposed regardless of fault. Joint Final Pretrial Order ¶ IV.36. Defendants do not contend that a meritorious challenge exists to the findings, made in the 1985 consent order, that four residences located approximately 100 feet north of the Bridgeport site show contamination in their drinking water wells, and that the drinking water wells of at least three more persons are threatened by the direction and proximity of the contamination. Nor do defendants assert that there is a meritorious defense to the EPA's allegation that the presence of hazardous substances at the Bridgeport facility and their migration to surrounding soils and groundwater constitute a release within the meaning of section 101(22) of CERCLA, 42 U.S.C. § 9601(22). Accordingly, the court finds that defendants have not shown a likelihood of success in defending Chemical Leaman against claims under CERCLA.

Defendants also ask this court to find that timely notice would have resulted in a likelihood that the insurance carriers would have reached a more favorable settlement. However, defendants fail to demonstrate what better arrangement the insurance carriers would have been able to obtain if they had assumed Chemical Leaman's defense upon timely notice. *Cf. Witco Corp. v. Travelers Indem. Co.*, Civ. No. 86–2907, 1987 U.S.Dist. LEXIS ** 44–45 (D.N.J. May 1, 1987).

██ Finally, defendants present evidence tending to show that Chemical Leaman's *implementation* of the cleanup of the Bridgeport site pursuant to its liability under CERCLA has led to *higher* cleanup costs than would have resulted had the insurance carriers been involved in the case following timely notice. In particular, defendants claim that the work of Environmental Resources Management, Inc., the firm hired by Chemical Leaman to assist in the CERCLA cleanup, was substandard, resulting in increased costs. The court finds that this evidence, while irrelevant to the notice inquiry of whether defendants suffered a likelihood appreciable prejudice, may nevertheless go to the jury for its determination of the amount of the cleanup costs pursuant to CERCLA for which defendants are liable. Defendants' policies obligate the carriers to indemnify Chemical Leaman only for "all sums which the insured shall become legally obligated to pay as damages ... caused by an occurrence." Increased cleanup costs incurred by plaintiff as a result of Chemical Leaman's or its agent's substandard work are not "*caused* by an occurrence." Rather, they are caused by the insured's allegedly poor handling of its cleanup obligations. These costs are more akin to business losses than to tort liability. And, as the Appellate Division has emphasized, liability policies provide coverage for the insured's "tort lia-

bility for [property] damages to others and not for economic or business losses suffered by the insured." *Broadwell Realty Serv. Inc. v. Fidelity & Casualty Co.,* 218 N.J.Super. 516, 526, 528 A.2d 76 (App.Div.1979); *cf. Weedo v. Stone–E–Brick, Inc.,* 81 N.J. 233, 240, 405 A.2d 788 (1979). Accordingly, increased cleanup costs found by the jury to be caused by plaintiff's substandard work may not be recovered under defendants' policies.

In conclusion, the court recognizes that the law should not endure lightly an insured's failure to make timely notification under a policy. Indeed, a four to five year delay strains the limits of judicial tolerance. *But see ·Peskin v. Liberty Mut. Ins. Co.,* 219 N.J.Super. 479, 530 A.2d 822 (App.Div.1987) (remanding case for further findings on a novel appreciable prejudice theory where insured waited 11 years to give notice of claim). However, New Jersey courts have consistently required carriers to establish that they suffered a likelihood of appreciable prejudice before requiring the insured to forfeit its coverage despite the premiums it already paid. Defendants have not submitted sufficient evidence to create a genuine dispute on whether they have satisfied their burden. Accordingly, the court grants plaintiff's summary judgment motion on the late notice issue.

## VII. Failure to Cooperate

■ New Jersey law provides that an insurance carrier may disclaim coverage pursuant to a cooperation clause only if it proves (1) that the insured breached the cooperation clause and (2) that the carrier suffered a likelihood of appreciable prejudice as a result of this breach. *Solvents Recovery Serv. v. Midland Ins. Co.,* 218 N.J.Super. 49, 54, 526 A.2d 1112 (App.Div.1987). First, the court must grant Chemical Leaman's motion for summary judgment on the cooperation clause as against Aetna. Aetna has stipulated that:

By at least May 23, 1988, and until April 12, 1989, when Chemical Leaman instituted this lawsuit, Aetna investigated Chemical Leaman's claim. Pursuant to this investigation, Aetna has interviewed four Chemical Leaman personnel and has reviewed Chemical Leaman's files and records. Chemical Leaman cooperated with

this investigation and provided information which Aetna requested until Chemical Leaman determined that legal action was necessary.

Joint Final Pretrial Order ¶ IV.43. Aetna is bound by this stipulation. Accordingly, the court finds that Chemical Leaman did not breach the cooperation clause in its policies with Aetna.

■ Chemical Leaman's motion for summary judgment on the cooperation clause in the LMI policies must also succeed. Chemical Leaman notified LMI of its claim on March 30, 1989. Chemical Leaman filed the present suit against LMI on April 12, 1989. Even assuming that plaintiff failed whatsoever to cooperate with LMI between these two dates, the court must find that LMI suffered no likelihood of appreciable prejudice. LMI has submitted no evidence of witnesses dying or witnesses' memories fading during this period. Nor has LMI shown that Chemical Leaman altered the Bridgeport site in any way that hampered LMI's ability to investigate the underlying CERCLA claim against Chemical Leaman or Chemical Leaman's claim against LMI. Based on these findings, the court grants Chemical Leaman's motion for summary judgment as against LMI on the cooperation clause issue.

## VIII. Aetna's Duty to Defend

Plaintiff seeks recovery from Aetna for certain costs incurred in connection with the defense of the underlying CERCLA suit. In particular, these costs include: (1) studies and tests made in connection with the preparation of the RI/FS; (2) engineering and other expert fees; (3) attorneys fees associated with the EPA's administrative process; and (4) administrative and oversight costs reimbursable to the EPA. Pl.'s Br. at 55. Plaintiff also asks for a declaration that Aetna is presently obligated under its policies to provide Chemical Leaman with a defense. Since being notified on April 18, 1988, Aetna has refused to defend Chemical Leaman.

### A. Pre–Notice Defense Costs

■ A threshold issue involves whether Aetna can be held responsible for the in-

sured's defense costs incurred before April 18, 1988. The court holds that it cannot. In *SL Industries v. American Motorists Insurance Co.*, the New Jersey Supreme Court ruled "that the duty to defend is triggered by facts *known* to the insurer." 128 N.J. 188, 199, 607 A.2d 1266 (1992) (emphasis in original). According to the court:

> the insured being sued is responsible for promptly conveying to its insurance company the information that it believes will trigger coverage. If it conveys that information properly and promptly, it will be reimbursed for previously expended defense costs. However, if the insured does not properly forward the information to the insurance company, the insured cannot demand reimbursement from the insurer for defense costs the insurer had no opportunity to control.... [W]hen the insured's delay in providing relevant information prevents the insurer from assuming control of the defense, the insurance company is liable only for that portion of the defense costs arising after it was informed of the facts triggering the duty to defend.

*Id.* at 199–200, 607 A.2d 1266. Chemical Leaman has already conceded that it breached the notice clause. Moreover, the EPA's placement of the Bridgeport site on the Superfund national priorities list in 1984 and the institution of the CERCLA action in 1985 clearly constituted information relevant to triggering Aetna's coverage and duty to defend. Therefore, the court holds that Aetna is not responsible for reimbursing plaintiff for defense costs incurred by Chemical Leaman prior to April 18, 1988.

### B. *Post–Notice Defense Costs*

In *Hartford Accident & Indemnity Co. v. Aetna Life & Casualty Inc.*, 98 N.J. 18, 483 A.2d 402 (1984), the New Jersey Supreme Court defined an insurance carrier's duty to defend under provisions similar to the ones in Aetna's policies:

> It is evident on the face of the "duty to defend" clause that the duties to indemnify and to defend are closely related and that neither duty exists except with respect to occurrences for which the policy provides coverage. It is irrelevant to the duty to defend whether the suit is well founded or groundless, ... but the duty extends only to claims within the coverage of the policy. Stated another way, the duty to defend extends only to claims on which there would be a duty to indemnify in the event of a judgment adverse to the insured.

*Id.* at 22, 483 A.2d 402 (citation omitted). A carrier's obligations in a particular case are "generally determined by comparing the allegations in the complaint with the language of the policy. When the two correspond, the insurer must defend the suit." *SL Indus. v. Am. Motorists Ins. Co.*, 128 N.J. 188, 197, 607 A.2d 1266 (1992) (citation omitted). Thus, "[t]he duty to defend comes into being when the complaint states a claim constituting a risk insured against." *Danek v. Hommer*, 28 N.J.Super. 68, 77, 100 A.2d 198 (App.Div.1953), *aff'd*, 15 N.J. 573, 105 A.2d 677 (1954).

A particular problem arises when the complaint in the underlying litigation does not contain allegations which, if proven at trial, would suffice to establish coverage. The New Jersey Supreme Court addressed this scenario in *Burd v. Sussex Mutual Insurance Co.*, 56 N.J. 383, 267 A.2d 7 (1970). "[W]hen coverage ... depends upon a factual issue which will not be resolved by the trial of the third party's suit against the insured, the duty to defend may depend upon the actual facts and not upon the allegations in the complaint." *Id.* at 388, 267 A.2d 7; *see also Hartford v. Aetna*, 98 N.J. at 23–24, 483 A.2d 402. Thus, New Jersey law contemplates that the insurance carrier may refrain from actually defending the insured in the underlying litigation where the underlying litigation will not resolve an issue central to coverage. *See CPS Chem. Co. v. Continental Ins. Co.*, 203 N.J.Super. 15, 495 A.2d 886 (App.Div.1985). The primary reason for the *Burd* rule is to preclude the possibility of a conflict between the interests of the carrier and the insured if the carrier assumes the defense in an underlying suit that will not necessarily resolve all outstanding issues as to coverage. "Whenever the carrier's position so diverges from the insured's that the carrier cannot defend the action with complete fidelity to the insured, there must be a proceeding in which the carrier and the in-

sured, represented by counsel of their own choice, may fight out their differences." *Burd,* 56 N.J. at 391, 267 A.2d 7.

The *Burd* rule, however, does not "free the carrier from its covenant to defend, but rather translate[s] its obligation into one to reimburse the insured if it is later adjudged that the claim was one within the policy covenant to pay." *Id.* at 390, 267 A.2d 7. The practical effect of this rule is that "an insured must initially assume the costs of defense itself, subject to reimbursement by the insurer if it prevails on the coverage question." *Hartford v. Aetna,* 98 N.J. at 24, 483 A.2d 402.

■ In the present case, the underlying CERCLA claim is grounded in strict liability. A comparison of the facts necessary to establish liability under the CERCLA complaint with the facts necessary to establish coverage under Aetna's policies reveals a critical discrepancy on the issue of Chemical Leaman's intent. The issue of intent plays no role in establishing CERCLA liability. *Hatco Corp.,* 801 F.Supp. 1334, 1365 (D.N.J. 1992). But under Aetna's policies, Chemical Leaman may obtain coverage only if it can show it did not intend to cause the environmental damage. Accordingly, the *Burd* rule controls Aetna's obligations to fulfill its duty to defend. If the present action establishes coverage, then Aetna must reimburse Chemical Leaman for its post-notice defense costs. The court, however, must deny plaintiff's motion for summary judgment on Aetna's present duty to defend. *Id.* 801 F.Supp. at 1364–66; *Heldor Indus., Inc. v. Atlantic Mut. Ins. Co.,* 229 N.J.Super. 390, 399, 551 A.2d 1001 (App.Div.1988); *CPS Chem. Co., Inc. v. Continental Ins. Co.,* 203 N.J.Super. 15, 21, 495 A.2d 886 (App.Div.1985).

## IX. Conclusion

Based on the foregoing analyses, the court grants in part and denies in part the parties' cross-motions for summary judgment. The parties are also ordered to submit on the day of trial a joint statement of material facts deemed established in this opinion pursuant to Federal Rule of Civil Procedure 56(d). An appropriate order will be entered.

## ORDER

This matter having come before the court on the cross-motions of the parties for summary judgment, as well on the various motions of the parties for leave to file briefs in excess of the established page limits;

The court having heard oral argument on the parties' cross-motions for summary judgment on November 23, 1992 and having carefully considered the submissions of the parties; and

For the reasons stated in the court's opinion of this date;

IT IS on this 10th day of March 1993 hereby

ORDERED that the motion of plaintiff Chemical Leaman Tank Lines, Inc. ("Chemical Leaman"), for summary judgment is GRANTED in part and DENIED in part, in that:

(a) There remain genuine issues of material fact on whether Chemical Leaman expected and intended to cause soil and ground water damage; and

(b) There remain genuine issues of material fact on whether the continuous trigger theory is applicable to the present case; and

(c) Chemical Leaman may not recover for soil contamination on any of defendants' policies that contain a pollution exclusion; and

(d) There remain genuine issues of material fact on whether Chemical Leaman may recover for groundwater contamination on any of defendants' policies that contain a pollution exclusion; and

(e) Chemical Leaman is not barred from coverage under defendants' policies by the policies' notice clauses; and

(f) Chemical Leaman is not barred from coverage under defendants' policies by the defense of laches; and

(g) Chemical Leaman is not barred from coverage under defendants' policies by the policies' cooperation clauses; and

(h) Chemical Leaman is not barred from coverage under defendants' policies by the defense of estoppel; and

(i) Chemical Leaman may not recover from Aetna Casualty and Surety Co. ("Aetna") reimbursements for defense costs incurred by Chemical Leaman prior to April 18, 1988; and

(j) Aetna' duty to defend Chemical Leaman is not presently triggered, but rather must await the outcome of the present trial of Aetna's duty to indemnify; and

IT IS FURTHER ORDERED that the cross-motion of defendant Aetna is GRANTED in part and DENIED in part, in that:

(a) There has occurred property damage to trigger Aetna's policy in effect from April 1, 1960 to April 1, 1961; and

(b) Chemical Leaman may not recover under Aetna's policies in effect prior to April 1, 1960; and

(c) There remain genuine issues of material fact on whether Chemical Leaman expected and intended to cause soil and groundwater damage; and

(d) There remain genuine issues of material fact on whether the continuous trigger theory is applicable to the present case; and

(e) Chemical Leaman may not recover for soil contamination on any of Aetna's policies that contain a pollution exclusion; and

(f) There remain genuine issues of material fact of whether Chemical Leaman may recover for groundwater contamination on any of Aetna's policies that contain a pollution exclusion; and

(g) Chemical Leaman is not barred from coverage under Aetna's policies by the policies' notice clauses; and

(h) Chemical Leaman is not barred from coverage under Aetna's policies by the policies' cooperation clauses; and

IT IS FURTHER ORDERED that the cross-motion of defendants Robin Anthony Gildart Jackson, an Underwriter at Lloyds, London, et al. ("LMI"), is GRANTED in part and DENIED in part, in that:

(a) Chemical Leaman's 12G Statement of Material Facts Not In Dispute will not be stricken; and

(b) Chemical Leaman bears the burden of proof for establishing that it neither expected nor intended to cause soil and groundwater damage; and

(c) There remain genuine issues of material fact on whether Chemical Leaman expected and intended to cause soil and groundwater damage; and

(d) Chemical Leaman may not recover for soil contamination on any of LMI's policies that contain a pollution exclusion; and

(e) There remain genuine issues of material fact on whether Chemical Leaman may recover for groundwater contamination on any of LMI's policies that contain a pollution exclusion; and

(f) Reconsideration of this court's previous ruling on the owned-property exclusion is not warranted; and

(g) Chemical Leaman is not barred from coverage under LMI's policies by the policies' notice clauses; and

(h) Chemical Leaman is not barred from coverage under LMI's policies by the defense of laches; and

(i) Chemical Leaman is not barred from coverage under LMI's policies for pre-notice costs; and

IT IS FURTHER ORDERED that the parties shall submit to the court on March 15, 1993, a statement of material facts deemed established pursuant to Federal Rule of Civil Procedure 56(d) by the court's opinion of this date; and

IT IS FURTHER ORDERED that LMI's cross-motion for summary judgment that the absolute pollution exclusion in all the post-April 1, 1985 policies is DENIED as moot, in that Chemical Leaman has withdrawn all claims as against LMI under these policies; and

IT IS FURTHER ORDERED that Aetna's motion for leave to file a summary judgment brief exceeding 40 pages in GRANTED; and

IT IS FURTHER ORDERED that LMI's motion for leave to file a summary judgment brief exceeding 40 pages in GRANTED; and

IT IS FURTHER ORDERED that plaintiff's motion for leave to file a reply and

**1164**

opposition brief exceeding forty pages is GRANTED; and

IT IS FURTHER ORDERED that Aetna's motion for leave to file a reply and opposition brief in excess of 40 pages is GRANTED; and

IT IS FURTHER ORDERED that LMI's motion for leave to file a reply and opposition brief in excess of 15 pages is GRANTED.

No costs.